# SOUTH DAKOTA $v.$ YANKTON SIOUX TRIBE ET AL.

No. 96–1581.   Argued December 8, 1997—Decided January 26, 1998

332

O'CONNOR, J., delivered the opinion for a unanimous Court.

*Mark W. Barnett*, Attorney General of South Dakota, argued the cause for petitioner. With him on the briefs was *John Patrick Guhin*, Deputy Attorney General. *Kenneth W. Cotton* filed a brief for the Southern Missouri Waste Management District, respondent under this Court's Rule 12.4, in support of petitioner.

*James G. Abourezk* argued the cause for respondent Yankton Sioux Tribe et al. With him on the brief were *Bobbie J. Rasmusson, Michael H. Scarmon,* and *Paul Bender.*

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Acting Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler,* and *Edward J. Shawaker.**

*Briefs of *amici curiae* urging reversal were filed for Charles Mix County, South Dakota, by *Tom D. Tobin* and *Matthew F. Gaffey;* for the City of Dante et al. by *Timothy R. Whalen;* for Duchesne County, Utah, by *Herbert Wm. Gillespie;* and for Lewis County, Idaho, by *Kimron R. Torgerson.*

*Reid Peyton Chambers, Arthur Lazarus, Jr.,* and *William R. Perry* filed a brief for the Standing Rock Sioux Tribe et al. as *amici curiae* urging affirmance.

A brief of *amici curiae* was filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, and *Thomas F. Gede,* Special Assistant Attorney General, *Alan G. Lance,* Attorney General of Idaho, and *Steven W. Strack,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Jeremiah W. (Jay) Nixon* of Missouri,

JUSTICE O'CONNOR delivered the opinion of the Court.

This case presents the question whether, in an 1894 statute that ratified an agreement for the sale of surplus tribal lands, Congress diminished the boundaries of the Yankton Sioux Reservation in South Dakota. The reservation was established pursuant to an 1858 Treaty between the United States and the Yankton Sioux Tribe. Subsequently, under the Indian General Allotment Act, Act of Feb. 8, 1887, 24 Stat. 388, 25 U. S. C. § 331 (Dawes Act), individual members of the Tribe received allotments of reservation land, and the Government then negotiated with the Tribe for the cession of the remaining, unallotted lands. The issue we confront illustrates the jurisdictional quandaries wrought by the allotment policy: We must decide whether a landfill constructed on non-Indian fee land that falls within the boundaries of the original Yankton Reservation remains subject to federal environmental regulations. If the divestiture of Indian property in 1894 effected a diminishment of Indian territory, then the ceded lands no longer constitute "Indian country" as defined by 18 U. S. C. § 1151(a), and the State now has primary jurisdiction over them. In light of the operative language of the 1894 Act, and the circumstances surrounding its passage, we hold that Congress intended to diminish the Yankton Reservation and consequently that the waste site is not in Indian country.

## I

### A

At the outset of the 19th century, the Yankton Sioux Tribe held exclusive dominion over 13 million acres of land between the Des Moines and Missouri Rivers, near the boundary that currently divides North and South Dakota. H. Hoover, The Yankton Sioux 25 (1988). In 1858, the

*Frankie Sue Del Papa* of Nevada, *Jan Graham* of Utah, and *William U. Hill* of Wyoming.

Yanktons entered into a treaty with the United States renouncing their claim to more than 11 million acres of their aboriginal lands in the north-central plains. Treaty of Apr. 19, 1858, 11 Stat. 743. Pursuant to the agreement, the Tribe ceded

> "all the lands now owned, possessed, or claimed by them, wherever situated, except four hundred thousand acres thereof, situated and described as follows, to wit—Beginning at the mouth of the Naw-izi-wa-koo-pah or Chouteau River and extending up the Missouri River thirty miles; thence due north to a point; thence easterly to a point on the said Chouteau River; thence down said river to the place of beginning, so as to include the said quantity of four hundred thousand acres." Art. I, *id.*, at 744.

The retained portion of the Tribe's lands, located in what is now the southeastern part of Charles Mix County, South Dakota, was later surveyed and determined to encompass 430,405 acres. See Letter from the Commissioner of Indian Affairs to the Secretary of the Interior (Dec. 9, 1893), reprinted in S. Exec. Doc. No. 27, 53d Cong., 2d Sess., 5 (1894) (hereinafter Letter). In consideration for the cession of lands and release of claims, the United States pledged to protect the Yankton Tribe in their "quiet and peaceable possession" of this reservation and agreed that "[n]o white person," with narrow exceptions, would "be permitted to reside or make any settlement upon any part of the [reservation]." Arts. IV, X, 11 Stat. 744, 747. The Federal Government further promised to pay the Tribe, or expend for the benefit of members of the Tribe, $1.6 million over a 50-year period, and appropriated an additional $50,000 to aid the Tribe in its transition to the reservation through the purchase of livestock and agricultural implements, and the construction of houses, schools, and other buildings.

Not all of this assistance was forthcoming, and the Tribe experienced severe financial difficulties in the years that followed, compounded by weather cycles of drought and devastating floods.  When war broke out between the United States and the Sioux Nation in 1862, the Yankton Tribe alone sided with the Federal Government, a decision that isolated it from the rest of the Sioux Federation and caused severe inner turmoil as well.  The Tribe's difficulties coincided with a period of rapid growth in the United States' population, increasing westward migration, and ensuing demands from non-Indians to open Indian holdings throughout the Western States to settlement.

In response to these "familiar forces," *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 431 (1975), Congress retreated from the reservation concept and began to dismantle the territories that it had previously set aside as permanent and exclusive homes for Indian tribes. See *Solem* v. *Bartlett*, 465 U. S. 463, 466 (1984).  The pressure from westward-bound homesteaders, and the belief that the Indians would benefit from private property ownership, prompted passage of the Dawes Act in 1887, 24 Stat. 388. The Dawes Act permitted the Federal Government to allot tracts of tribal land to individual Indians and, with tribal consent, to open the remaining holdings to non-Indian settlement.  Within a generation or two, it was thought, the tribes would dissolve, their reservations would disappear, and individual Indians would be absorbed into the larger community of white settlers.  See Hearings on H. R. 7902 before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 428 (1934) (statement of D. S. Otis on the history of the allotment policy).  With respect to the Yankton Reservation in particular, some Members of Congress speculated that "close contact with the frugal, moral, and industrious people who will settle [on the reservation] [would] stimulate individual effort and make [the Tribe's] progress much

more rapid than heretofore." Report of the Senate Committee on Indian Affairs, S. Rep. No. 196, 53d Cong., 2d Sess., 1 (1894).

In accordance with the Dawes Act, each member of the Yankton Tribe received a 160-acre tract from the existing reservation, held in trust by the United States for 25 years. Members of the Tribe acquired parcels of land throughout the 1858 reservation, although many of the allotments were clustered in the southern part, near the Missouri River. By 1890, the allotting agent had apportioned 167,325 acres of reservation land, 95,000 additional acres were subsequently allotted under the Act of February 28, 1891, 26 Stat. 795, and a small amount of acreage was reserved for government and religious purposes. The surplus amounted to approximately 168,000 acres of unallotted lands. See Letter, at 5.

In 1892, the Secretary of the Interior dispatched a three-member Yankton Indian Commission to Greenwood, South Dakota, to negotiate for the acquisition of these surplus lands. See Act of July 13, 1892, 27 Stat. 137 (appropriating funds to enable the Secretary to "negotiate with any Indians for the surrender of portions of their respective reservations"). When the Commissioners arrived on the reservation in October 1892, they informed the Tribe that they had been sent by the "Great Father" to discuss the cession of "this land that [members of the Tribe] hold in common," Council of the Yankton Indians (Oct. 8, 1892), transcribed in S. Exec. Doc. No. 27, at 48, and they abruptly encountered opposition to the sale from traditionalist tribal leaders. See Report of the Yankton Indian Commission (Mar. 31, 1893), reprinted in S. Exec. Doc. No. 27, at 9–11 (hereinafter Report). In the lengthy negotiations that followed, members of the Tribe raised concerns about the suggested price per acre, the preservation of their annuities under the 1858 Treaty, and other outstanding claims against the United States, but they did not discuss the future boundaries of the

reservation. Once the Commissioners garnered a measure of support for the sale of the unallotted lands, they submitted a proposed agreement to the Tribe.[1]

___

[1] The text of the agreement provides in relevant part:

"Article I.

"The Yankton tribe of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said Indians as aforesaid.

"Article II.

"In consideration for the lands ceded, sold, relinquished, and conveyed to the United States as aforesaid, the United States stipulates and agrees to pay to the said Yankton tribe of Sioux Indians the sum of six hundred thousand dollars ($600,000), as hereinbefore provided for.

. . . . .

"Article VII.

"In addition to the stipulations in the preceding articles, upon the ratification of this agreement by Congress, the United States shall pay to the Yankton tribe of Sioux Indians as follows: To each person whose name is signed to this agreement and to each other male member of the tribe who is eighteen years old or older at the date of this agreement, twenty dollars ($20) in one double eagle, struck in the year 1892 as a memorial of this agreement. . . .

"Article VIII.

"Such part of the surplus lands hereby ceded and sold to the United States as may now be occupied by the United States for agency, schools, and other purposes, shall be reserved from sale to settlers until they are no longer required for such purposes. But all other lands included in this sale shall, immediately after the ratification of this agreement by Congress, be offered for sale through the proper land office, to be disposed of under the existing land laws of the United States, to actual bona fide settlers only.

. . . . .

"Article XV.

"The claim of fifty-one Yankton Sioux Indians, who were employed as scouts by General Alf. Sully in 1864, for additional compensation at the rate of two hundred and twenty-five dollars ($225) each, aggregating the sum of eleven thousand four hundred and seventy-five dollars ($11,475) is hereby recognized as just, and within ninety days (90) after the ratification

Article I of the agreement provided that the Tribe would "cede, sell, relinquish, and convey to the United States" all of the unallotted lands on the reservation.   Pursuant to Article II, the United States agreed to compensate the Tribe in a single payment of $600,000, which amounted to $3.60 per acre.[2]   Much of the agreement focused on the payment and disposition of that sum.   Article VII further provided that all the signatories and adult male members of the Tribe would receive a $20 gold piece to commemorate the agreement.   Some members of the Tribe also sought unpaid wages from their service as scouts in the Sioux War, and in Article XV, the United States recognized their claim.   The saving clause in Article XVIII, the core of the current disagreement between the parties to this case, stated that noth-

---

of this agreement by Congress the same shall be paid in lawful money of the United States to the said scouts or to their heirs.

"Article XVII.

"No intoxicating liquors nor other intoxicants shall ever be sold or given away upon any of the lands by this agreement ceded and sold to the United States, nor upon any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the treaty between the said Indians and the United States, dated April 19th, 1858, and as afterwards surveyed and set off to the said Indians.   The penalty for the violation of this provision shall be such as Congress may prescribe in the act ratifying this agreement.

"Article XVIII.

"Nothing in this agreement shall be construed to abrogate the treaty of April 19th, 1858, between the Yankton tribe of Sioux Indians and the United States.   And after the signing of this agreement, and its ratification by Congress, all provisions of the said treaty of April 19th, 1858, shall be in full force and effect, the same as though this agreement had not been made, and the said Yankton Indians shall continue to receive their annuities under the said treaty of April 19th, 1858."   28 Stat. 314–318.

[2] In 1980, the Court of Claims concluded that the land ceded by the Tribe had a fair market value of $6.65 per acre, or $1,337,381.50, that the $600,000 paid pursuant to the 1892 agreement was "unconscionable and grossly inadequate," and that the Tribe was entitled to recover the difference. *Yankton Sioux Tribe* v. *United States*, 623 F. 2d 159, 178.

ing in the agreement's terms "shall be construed to abrogate the treaty [of 1858]" and that "all provisions of the said treaty . . . shall be in full force and effect, the same as though this agreement had not been made."

By March 1893, the Commissioners had collected signatures from 255 of the 458 male members of the Tribe eligible to vote, and thus obtained the requisite majority endorsement. The Yankton Indian Commission filed its report in May 1893, but congressional consideration was delayed by an investigation into allegations of fraud in the procurement of signatures. On August 15, 1894, Congress finally ratified the 1892 agreement, together with similar surplus land sale agreements between the United States and the Siletz and Nez Perce Tribes. Act of Aug. 15, 1894, 28 Stat. 286. The 1894 Act incorporated the 1892 agreement in its entirety and appropriated the necessary funds to compensate the Tribe for the ceded lands, to satisfy the claims for scout pay, and to award the commemorative $20 gold pieces. Congress also prescribed the punishment for violating a liquor prohibition included in the agreement and reserved certain sections in each township for common-school purposes. *Ibid.*

President Cleveland issued a proclamation opening the ceded lands to settlement as of May 21, 1895, and non-Indians rapidly acquired them. By the turn of the century, 90 percent of the unallotted tracts had been settled. See *Yankton Sioux Tribe* v. *United States*, 623 F. 2d 159, 171 (Ct. Cl. 1980). A majority of the individual allotments granted to members of the Tribe also were subsequently conveyed in fee by the members to non-Indians. Today, the total Indian holdings in the region consist of approximately 30,000 acres of allotted land and 6,000 acres of tribal land. Indian Reservations: A State and Federal Handbook 260 (1986).

Although formally repudiated with the passage of the Indian Reorganization Act in 1934, 48 Stat. 984, 25 U. S. C. § 461, the policy favoring assimilation of Indian tribes through the allotment of reservation land left behind a last-

ing legacy. The conflict between the modern-day approach to tribal self-determination and the assimilation impetus of the allotment era has engendered "a spate of jurisdictional disputes between state and federal officials as to which sovereign has authority over lands that were opened by the [surplus land] Acts and have since passed out of Indian ownership." *Solem*, 465 U. S., at 467.

## B

We confront such a dispute in the instant case, in which tribal, federal, and state officials disagree as to the environmental regulations applicable to a proposed waste site. In February 1992, several South Dakota counties formed the Southern Missouri Recycling and Waste Management District (hereinafter Waste District) for the purpose of constructing a municipal solid waste disposal facility. The Waste District acquired the site for the landfill, which falls within the 1858 boundaries of the Yankton Sioux Reservation, in fee from a non-Indian. The predicate for the parties' claims in this case is that the waste site lies on land ceded in the 1894 Act, and the record supports that assumption.

In the Tribe's complaint, the proposed landfill is described as "the south one-half north one-quarter (S½ N¼), Section 6, Township 96 North, Range 65 West (S6, T96N, R65W) of the Fifth Principal Meridan [sic], Charles Mix County, South Dakota." App. 24. That description corresponds to the account of a tract of land deeded to Lars K. Langeland under the Homestead Act in 1904. See App. to Brief for Respondent Southern Missouri Waste Management District 1a–2a. Because all of the land allotted to individual Indians on the Yankton Reservation was inalienable, pursuant to the Dawes Act, during a 25-year trust period, the tract acquired by a homesteader in 1904 and currently owned by the Waste District must consist of unallotted land ceded in the 1894 Act. (The Dawes Act was amended in 1906 by the Burke Act, 34 Stat. 182, 25 U. S. C. § 349, which permitted the issuance of

some fee-simple patents before the expiration of the 25-year trust period, but the restrictions on alienation remained in place as of 1904.)

When the Waste District sought a state permit for the landfill, the Yankton Tribe intervened and objected on environmental grounds, arguing that the proposed compacted clay liner was inadequate to prevent leakage. After an administrative hearing in December 1993, the State Board of Minerals and the Environment granted the solid waste permit, finding that South Dakota regulations did not require the installation of the synthetic composite liner the Tribe had requested. The Sixth Judicial Circuit affirmed the Board's decision, and no appeal was taken to the State Supreme Court.

In September 1994, the Tribe filed suit in the Federal District Court for the District of South Dakota to enjoin construction of the landfill, and the Waste District joined South Dakota as a third party so that the State could defend its jurisdiction to grant the permit. The Tribe also sought a declaratory judgment that the permit did not comport with Federal Environmental Protection Agency (EPA) regulations mandating the installation of a composite liner in the landfill. See 40 CFR § 258.40(b) (1997). The District Court held, in accordance with our decision in *South Dakota* v. *Bourland,* 508 U. S. 679, 692 (1993), that the Tribe itself could not assert regulatory jurisdiction over the non-Indian activity on fee lands. Furthermore, because the Tribe did not establish that the landfill would compromise the "political integrity, the economic security, or the health or welfare of the tribe," the court concluded that the Tribe could not invoke its inherent sovereignty under the exceptions in *Montana* v. *United States,* 450 U. S. 544, 566 (1981). Accordingly, the court declined to enjoin the landfill project, a decision the Tribe does not appeal. The District Court also determined, however, that the 1894 Act did not diminish the exterior boundaries of the reservation as delineated in the 1858

Treaty between the United States and the Tribe, and consequently that the waste site lies within an Indian reservation where federal environmental regulations apply.

On appeal by the State,[3] a divided panel of the Court of Appeals for the Eighth Circuit agreed that "Congress intended by its 1894 Act that the Yankton Sioux sell their surplus land to the government, but not their governmental authority over it." 99 F. 3d 1439, 1457 (1996). The court relied primarily on the saving clause in Article XVIII, reasoning that, given its "unusually expansive language," other sections of the 1894 Act "should be read narrowly to minimize any conflict with the 1858 treaty." *Id.*, at 1447. The court further concluded that neither the historical evidence nor the demographic development of the area could sustain a finding of diminishment. *Id.*, at 1457.

We granted certiorari to resolve a conflict between the decision of the Court of Appeals and a number of decisions of the South Dakota Supreme Court declaring that the reservation has been diminished.[4] 520 U. S. 1263 (1997). We now reverse the Eighth Circuit's decision and hold that the unallotted lands ceded as a result of the 1894 Act did not retain reservation status.

---

[3] The Waste District explains that it did not appeal because the District Court's decision allowed it to go forward with construction of the proposed landfill, but it filed a brief as a respondent supporting the petitioner State in this Court because "of the likelihood that the assertion of tribal jurisdiction will continue to affect the District in this or similar contexts." Brief for Respondent Southern Missouri Waste Management District 6, n. 6. With respect to the particular issue of the landfill's liner, the Waste District's concerns appear academic. The EPA has waived the requirement of a composite liner and has permitted construction to go forward with the compacted clay liner. See *Yankton Sioux Tribe* v. *Environmental Protection Agency,* 950 F. Supp. 1471, 1482 (SD 1996).

[4] See *State* v. *Greger,* 559 N. W. 2d 854 (S. D. 1997); see also *State* v. *Thompson,* 355 N. W. 2d 349, 350 (S. D. 1984); *State* v. *Williamson,* 87 S. D. 512, 515, 211 N. W. 2d 182, 184 (1973); *Wood* v. *Jameson,* 81 S. D. 12, 18–19, 130 N. W. 2d 95, 99 (1964).

## II

· States acquired primary jurisdiction over unallotted opened lands where "the applicable surplus land Act freed that land of its reservation status and thereby diminished the reservation boundaries." *Solem*, 465 U. S., at 467. In contrast, if a surplus land Act "simply offered non-Indians the opportunity to purchase land within established reservation boundaries," *id.*, at 470, then the entire opened area remained Indian country. Our touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose. See *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 615 (1977). Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. See, *e. g., Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56 (1978). Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, *United States* v. *Celestine*, 215 U. S. 278, 285 (1909), and its intent to do so must be "clear and plain," *United States* v. *Dion*, 476 U. S. 734, 738–739 (1986).

Here, we must determine whether Congress intended by the 1894 Act to modify the reservation set aside for the Yankton Tribe in the 1858 Treaty. Our inquiry is informed by the understanding that, at the turn of this century, Congress did not view the distinction between acquiring Indian property and assuming jurisdiction over Indian territory as a critical one, in part because "[t]he notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar," *Solem*, 465 U. S., at 468, and in part because Congress then assumed that the reservation system would fade over time. "Given this expectation, Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation." *Ibid.*; see also *Hagen* v. *Utah*, 510 U. S. 399, 426 (1994) (Blackmun, J., dissenting) ("As a result of the patina history has placed on the allotment

Acts, the Court is presented with questions that their architects could not have foreseen"). Thus, although "[t]he most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands," we have held that we will also consider "the historical context surrounding the passage of the surplus land Acts," and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there. *Id.*, at 411. Throughout this inquiry, "we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment." *Ibid.*

## A

Article I of the 1894 Act provides that the Tribe will "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation"; pursuant to Article II, the United States pledges a fixed payment of $600,000 in return. This "cession" and "sum certain" language is "precisely suited" to terminating reservation status. See *DeCoteau*, 420 U. S., at 445. Indeed, we have held that when a surplus land Act contains both explicit language of cession, evidencing "the present and total surrender of all tribal interests," and a provision for a fixed-sum payment, representing "an unconditional commitment from Congress to compensate the Indian tribe for its opened land," a "nearly conclusive," or "almost insurmountable," presumption of diminishment arises. *Solem, supra,* at 470; see also *Hagen, supra,* at 411.

The terms of the 1894 Act parallel the language that this Court found terminated the Lake Traverse Indian Reservation in *DeCoteau, supra,* at 445, and, as in *DeCoteau*, the 1894 Act ratified a negotiated agreement supported by a majority of the Tribe. Moreover, the Act we construe here more clearly indicates diminishment than did the surplus land Act at issue in *Hagen*, which we concluded diminished reservation lands even though it provided only that "all the

unallotted lands within said reservation shall be restored to the public domain." See 510 U. S., at 412.

The 1894 Act is also readily distinguishable from surplus land Acts that the Court has interpreted as maintaining reservation boundaries. In both *Seymour* v. *Superintendent of Wash. State Penitentiary*, 368 U. S. 351, 355 (1962), and *Mattz* v. *Arnett*, 412 U. S. 481, 501–502 (1973), we held that Acts declaring surplus land "subject to settlement, entry, and purchase," without more, did not evince congressional intent to diminish the reservations. Likewise, in *Solem*, we did not read a phrase authorizing the Secretary of the Interior to "sell and dispose" of surplus lands belonging to the Cheyenne River Sioux as language of cession. See 465 U. S., at 472. In contrast, the 1894 Act at issue here—a negotiated agreement providing for the total surrender of tribal claims in exchange for a fixed payment—bears the hallmarks of congressional intent to diminish a reservation.

## B

The Yankton Tribe and the United States, appearing as *amicus* for the Tribe, rest their argument against diminishment primarily on the saving clause in Article XVIII of the 1894 Act. The Tribe asserts that because that clause purported to conserve the provisions of the 1858 Treaty, the existing reservation boundaries were maintained. The United States urges a similarly "holistic" construction of the agreement, which would presume that the parties intended to modify the 1858 Treaty only insofar as necessary to open the surplus lands for settlement, without fundamentally altering the treaty's terms.

Such a literal construction of the saving clause, as the South Dakota Supreme Court noted in *State* v. *Greger*, 559 N. W. 2d 854, 863 (1997), would "impugn the entire sale." The unconditional relinquishment of the Tribe's territory for settlement by non-Indian homesteaders can by no means be reconciled with the central provisions of the 1858 Treaty,

which recognized the reservation as the Tribe's "permanent" home and prohibited white settlement there. See *Oregon Dept. of Fish and Wildlife* v. *Klamath Tribe*, 473 U. S. 753, 770 (1985) (discounting a saving clause on the basis of a "glaring inconsistency" between the original treaty and the subsequent agreement). Moreover, the Government's contention that the Tribe intended to cede some property but maintain the entire reservation as its territory contradicts the common understanding of the time: that tribal ownership was a critical component of reservation status. See *Solem, supra,* at 468. We "cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Klamath, supra,* at 774 (internal quotation marks and citation omitted).

Rather than read the saving clause in a manner that eviscerates the agreement in which it appears, we give it a "sensible construction" that avoids this "absurd conclusion." See *United States* v. *Granderson,* 511 U. S. 39, 56 (1994) (internal quotation marks omitted). The most plausible interpretation of Article XVIII revolves around the annuities in the form of cash, guns, ammunition, food, and clothing that the Tribe was to receive in exchange for its aboriginal claims for 50 years after the 1858 Treaty. Along with the proposed sale price, these annuities and other unrealized Yankton claims dominated the 1892 negotiations between the Commissioners and the Tribe. The tribal historian testified, before the District Court, that the loss of their rations would have been "disastrous" to the Tribe, App. 589, and members of the Tribe clearly perceived a threat to the annuities. At a particularly tense point in the negotiations, when the tide seemed to turn in favor of forces opposing the sale, Commissioner John J. Cole warned:

> "I want you to understand that you are absolutely dependent upon the Great Father to-day for a living. Let the Government send out instructions to your agent to cease to issue these rations, let the Government instruct

your agent to cease to issue your clothes. . . . Let the Government instruct him to cease to issue your supplies, let him take away the money to run your schools with, and I want to know what you would do. Everything you are wearing and eating is gratuity. Take all this away and throw this people wholly upon their own responsibility to take care of themselves, and what would be the result? Not one-fourth of your people could live through the winter, and when the grass grows again it would be nourished by the dust of all the balance of your noble tribe." Council of the Yankton Indians (Dec. 10, 1892), transcribed in S. Exec. Doc. No. 27, at 74.

Given the Tribe's evident concern with reaffirmance of the Government's obligations under the 1858 Treaty, and the Commissioners' tendency to wield the payments as an inducement to sign the agreement, we conclude that the saving clause pertains to the continuance of annuities, not the 1858 borders.

The language in Article XVIII specifically ensuring that the "Yankton Indians shall continue to receive their annuities under the [1858 Treaty]" underscores the limited purpose and scope of the saving clause. It is true that the Court avoids interpreting statutes in a way that "renders some words altogether redundant." *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 574 (1995). But in light of the fact that the record of the negotiations between the Commissioners and the Yankton Tribe contains no discussion of the preservation of the 1858 boundaries but many references to the Government's failure to fulfill earlier promises, see, *e. g.*, Council of the Yankton Indians (Dec. 3, 1892), transcribed in S. Exec. Doc. No. 27, at 54–55, it seems most likely that the parties inserted and understood Article XVIII, including both the general statement regarding the force of the 1858 Treaty and the particular provision that payments would continue as specified therein, to assuage the Tribes' concerns about their past claims and future entitlements.

Indeed, apart from the pledge to pay annuities, it is hard to identify any provision in the 1858 Treaty that the Tribe might have sought to preserve, other than those plainly inconsistent with or expressly included in the 1894 Act. The Government points to Article XI of the treaty, in which the Tribe agreed to submit for federal resolution "all matters of dispute and difficulty·between themselves and other Indians," 11 Stat. 747, and urges us to extrapolate from this provision that the Tribe implicitly retained jurisdiction over internal matters, and from there to apply the standard canon of Indian law that "[o]nce powers of tribal self-government or other Indian rights are shown to exist, by treaty or otherwise, later federal action which might arguably abridge them is construed narrowly in favor of retaining Indian rights." F. Cohen, Handbook of Federal Indian Law 224 (1982) (hereinafter Cohen). But the treaty's reference to tribal authority is indirect, at best, and it does not persuade us to view the saving clause as an agreement to maintain exclusive tribal governance within the original reservation boundaries.

The Tribe further contends that because Article XVIII affirms that the 1858 Treaty will govern "the same as though [the 1892 agreement] had not been made," without reference to consistency between those agreements, it has more force than the standard saving clause. While the language of the saving clause is indeed unusual, we do not think it is meaningfully distinct from the saving clauses that have failed to move this Court to find that pre-existing treaties remain in effect under comparable circumstances. See, *e. g.*, *Klamath*, 473 U. S., at 769–770; *Montana*, 450 U. S., at 548, 558–559; *Rosebud*, 430 U. S., at 623 (Marshall, J., dissenting). Furthermore, "it is a commonplace of statutory construction that the specific" cession and sum certain language in Articles I and II "governs the general" terms of the saving clause. See *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992).

Finally, the Tribe argues that, at a minimum, the saving clause renders the statute equivocal, and that confronted with that ambiguity we must adopt the reading that favors the Tribe. See *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930). The principle according to which ambiguities are resolved to the benefit of Indian tribes is not, however, "a license to disregard clear expressions of tribal and congressional intent." *DeCoteau*, 420 U. S., at 447; see also *South Carolina* v. *Catawba Tribe, Inc.*, 476 U. S. 498, 506 (1986). In previous decisions, this Court has recognized that the precise cession and sum certain language contained in the 1894 Act plainly indicates diminishment, and a reasonable interpretation of the saving clause does not conflict with a like conclusion in this case.

## C

Both the State and the Tribe seek support for their respective positions in two other provisions of the 1894 Act: a clause reserving sections of each township for schools and a prohibition on liquor within the ceded lands. Upon ratification, Congress added that "the sixteenth and thirty-sixth sections in each Congressional township . . . shall be reserved for common-school purposes and be subject to the laws of the State of South Dakota." 28 Stat. 319. This "school sections clause" parallels the enabling Act admitting South Dakota to the Union, which grants the State sections 16 and 36 in every township for the support of common schools, but expressly exempts reservation land "until the reservation shall have been extinguished and such lands restored to . . . the public domain." Act of Feb. 22, 1889, 25 Stat. 679. When considering a similar provision included in the Act ceding the Rosebud Sioux Reservation in South Dakota, the Court discerned congressional intent to diminish the reservation, "thereby making the sections available for disposition to the State of South Dakota for 'school sections.'" *Rosebud, supra*, at 601. The Tribe argues that the clause in the 1894 Act specifying the application of state law would be superfluous if Congress

intended to diminish the reservation. As the Court stated in *DeCoteau,* however, "the natural inference would be that state law is to govern the manner in which the 16th and 36th sections are to be employed 'for common school purposes,'" which "implies nothing about the presence or absence of state civil and criminal jurisdiction over the remainder of the ceded lands." 420 U. S., at 446, n. 33.

Although we agree with the State that the school sections clause reinforces the view that Congress intended to extinguish the reservation status of the unallotted land, a somewhat contradictory provision counsels against finding the reservation terminated. Article VIII of the 1894 Act reserved from sale those surplus lands "as may now be occupied by the United States for agency, schools, and other purposes." In *Solem,* the Court noted with respect to virtually identical language that "[i]t is difficult to imagine why Congress would have reserved lands for such purposes if it did not anticipate that the opened area would remain part of the reservation." 465 U. S., at 474.

The State's position is more persuasively supported by the liquor prohibition included in Article XVII of the agreement. The provision prohibits the sale or offering of "intoxicating liquors" on "any of the lands by this agreement ceded and sold to the United States" or "any other lands within or comprising the reservations of the Yankton Sioux or Dakota Indians as described in the [1858] treaty," 28 Stat. 318, thus signaling a jurisdictional distinction between reservation and ceded land. The Commissioners' report recommends that Congress "fix a penalty for the violation of this provision which will make it most effective in preventing the introduction of intoxicants within the limits of the reservation," Report, at 21, which could be read to suggest that ceded lands remained part of the reservation. We conclude, however, that "the most reasonable inference from the inclusion of this provision is that Congress was aware that the opened, unallotted areas would henceforth not be 'Indian

country.'" *Rosebud, supra,* at 613. By 1892, Congress already had enacted laws prohibiting alcohol on Indian reservations, see Cohen 306–307, and "[w]e assume that Congress is aware of existing law when it passes legislation," *Miles* v. *Apex Marine Corp.,* 498 U. S. 19, 32 (1990). Furthermore, the Commissioner of Indian Affairs described the provision as prohibiting "the sale or disposition of intoxicants upon any of the lands *now* within the Yankton Reservation," Letter, at 6–7 (emphasis added), indicating that the lands would be severed from the reservation upon ratification of the agreement. In *Perrin* v. *United States,* 232 U. S. 478 (1914), we implied that the lands conveyed by the 1894 Act lost their reservation status when we construed Article XVII as applying to "ceded lands formerly included in the Yankton Sioux Indian Reservation." *Id.,* at 480. We now reaffirm that the terms of the 1894 Act, including both the explicit language of cession and the surrounding provisions, attest to Congress' intent to diminish the Yankton Reservation.

## III

Although we perceive congressional intent to diminish the reservation in the plain statutory language, we also take note of the contemporary historical context, subsequent congressional and administrative references to the reservation, and demographic trends. Even in the absence of a clear expression of congressional purpose in the text of a surplus land Act, unequivocal evidence derived from the surrounding circumstances may support the conclusion that a reservation has been diminished. See *Solem,* 465 U. S., at 471. In this case, although the context of the Act is not so compelling that, standing alone, it would indicate diminishment, neither does it rebut the "almost insurmountable presumption" that arises from the statute's plain terms. *Id.,* at 470.

## A

The "manner in which the transaction was negotiated" with the Yankton Tribe and "the tenor of legislative Reports

presented to Congress" reveal a contemporaneous under-standing that the proposed legislation modified the reserva-tion. *Id.*, at 471. In 1892, when the Commissioner of In-dian Affairs appointed the Yankton Commission, he charged its members to "negotiate with the [Tribe] for the cession of their surplus lands" and noted that the funds exchanged for the "relinquishment" of those lands would provide a future income for the Tribe. Instructions to the Yankton Indian Commission (July 27, 1892), reprinted in App. 98–99. The negotiations themselves confirm the understanding that by surrendering its interest in the unallotted lands, the Tribe would alter the reservation's character. Commissioner J. C. Adams informed members of the Tribe that once surplus lands were sold to the "Great Father," the Tribe would "as-sist in making the laws which will govern [members of the Tribe] as citizens of the State and nation." Council of the Yankton Indians (Oct. 8, 1892), transcribed in S. Exec. Doc. No. 27, at 48. In terms that strongly suggest a reconception of the reservation, Commissioner Cole admonished the Tribe:

> "This reservation alone proclaims the old time and the old conditions . . . . The tide of civilization is as resist-less as the tide of the ocean, and you have no choice but to accept it and live according to its methods or be destroyed by it. To accept it requires the sale of these surplus lands and the opening of this reservation to white settlement.
>
> "You were a great and powerful people when your abilities and energies were directed in harmony with the conditions which surrounded you, but the wave of civili-zation which swept over you found you unprepared for the new conditions and you became weak. . . . [Y]ou must accept the new life wholly. You must break down the barriers and invite the white man with all the elements of civilization, that your young men may have the same opportunities under the new conditions that your fathers

had under the old." Council of the Yankton Indians (Dec. 17, 1892), transcribed *id.*, at 81.

Cole's vivid language and entreaty to "break down the barriers" are reminiscent of the "picturesque" statement that Congress would "pull up the nails" holding down the outside boundary of the Uintah Reservation, which we viewed as evidence of diminishment in *Hagen*, 510 U. S., at 417.

Moreover, the Commissioners' report of the negotiations signaled their understanding that the cession of the surplus lands dissolved tribal governance of the 1858 reservation. They observed that "now that [members of the Tribe] have been allotted their lands in severalty and have sold their surplus land—the last property bond which assisted to hold them together in their tribal interest and estate—their tribal interests may be considered a thing of the past." Report, at 19. And, in a March 1894 letter to the Chairman of the Senate Committee on Indian Affairs, several Yankton chiefs and members of the Tribe indicated that they concurred in such an interpretation of the agreement's impact. The letter urged congressional ratification of the agreement, explaining that the signatories "want[ed] the laws of the United States and the State that we live in to be recognized and observed," and that they did not view it as desirable to "keep up the tribal relation . . . as the tribal relation on this reservation is an obstacle and hindrance to the advancement of civilization." S. Misc. Doc. No. 134, 53d Cong., 2d Sess., 1 (1894).

The legislative history itself adds little because Congress considered the Siletz, Nez Perce, and Yankton surplus land sale agreements at the same time, but the few relevant references from the floor debates support a finding of diminishment. Some members noted that the cessions would restore the surplus lands to the "public domain," see 53 Cong. Rec. 6425 (1894) (remarks of Rep. McCrae); *id.*, at 6426 (remarks of Rep. Hermann), language that indicates congressional intent to diminish a reservation, see *Hagen, supra*, at 418;

*Solem,* 465 U. S., at 475. That same phrase appears in the annual report of the Commissioner on Indian Affairs that was released in September 1894, just after congressional ratification of the agreement. See Annual Report of the Commissioner on Indian Affairs 26 (Sept. 14, 1894), excerpted in App. 450–452 (noting that under the Siletz, Nez Perce, and Yankton agreements, "some 880,000 acres of land will be restored to the public domain").

Finally, the Presidential Proclamation opening the lands to settlement declared that the Tribe had "ceded, sold, relinquished, and conveyed to the United States, all [its] claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said tribe by the first article [of the 1858 Treaty]." Presidential Proclamation (May 16, 1895), reprinted in App. 453. This Court has described substantially similar language as "an unambiguous, contemporaneous, statement by the Nation's Chief Executive, of a perceived disestablishment." *Rosebud,* 430 U. S., at 602–603.

B

Despite the apparent contemporaneous understanding that the 1894 Act diminished the reservation, in the years since, both Congress and the Executive Branch have described the reservation in contradictory terms and treated the region in an inconsistent manner. An 1896 statute, for example, refers to "homestead settlers upon the Yankton Indian Reservation," 29 Stat. 16, while in a Report included in the legislative history for that statute, the Commissioner of Indian Affairs discusses the "former" reservation, H. R. Rep. No. 100, 54th Cong., 1st Sess., 2 (1896). From the 1896 statutory reference to hearings on the Indian Gaming Regulatory Act nearly a century later, Congress has occasionally, though not invariably, referred to the "Yankton Sioux Reservation."[5]

_____

[5] Hearings on Pub. L. 100–497, The Indian Gaming Regulatory Act of 1988, before the Subcommittee on Native American Affairs of the House Committee on Natural Resources, 103d Cong., 2d Sess., 1 (1994) (held,

We have often observed, however, that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 348–349 (1963). Likewise, the scores of administrative documents and maps marshaled by the parties to support or contradict diminishment have limited interpretive value.[6] We need not linger over whether the many references to the Yankton Reservation in legislative

according to the record, at the Fort Randall Casino Hotel on the "Yankton Sioux Reservation"); see, *e. g.,* 143 Cong. Rec. S9616 (Sept. 18, 1997) (discussion of the Marty Indian School "located on the Yankton Sioux Reservation"); 135 Cong. Rec. 1656 (1989) (description of the Lake Andes-Wagner project, which irrigates "Indian-owned land located on the Yankton Sioux Reservation"). But see 35 Stat. 808 (referring to land "on the former Yankton Reservation").

[6] See, *e. g.,* Exec. Order No. 5173 (Aug. 9, 1929) (extending the trust period on the allotted lands "on the Yankton Sioux Reservation"); Exec. Order No. 2363 (Apr. 30, 1916) (same); Letter to Chairman, Committee on Indian Affairs, from Secretary of the Interior (Feb. 1, 1921), reprinted in App. 480 (stating that "Lake Andes is within the former Yankton-Sioux Indian Reservation"); Letter to Yankton Agency from the Commissioner of Indian Affairs (Aug. 20, 1930), reprinted in App. 481 (discussing lands "heretofore constituting a part of the reservation"); Bureau of the Census, U. S. Dept. of Commerce, Pub. No. 1990 CPH–1–43, p. 175 (1991), reprinted in App. 527 (listing population figures for the Yankton Reservation).

The Tribe also highlights a 1941 opinion letter issued by Felix Cohen, then-acting Solicitor of the Department of the Interior, in which he concluded that the Yankton Reservation had not been altered by the 1894 Act because allotments were "scattered over all the reservation," and the Act was thus distinguishable from statutes that "ceded a definite part of the reservation and treated the remaining areas as a diminished reservation." See Letter of Aug. 7, 1941, reprinted in 1 U. S. Dept. of Interior, Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1063, 1064 (1979). The letter has not been disavowed but was apparently ignored in subsequent determinations by the agency. A 1969 memorandum on tribal courts, for example, plainly stated that the 1894 Act "diminish[ed] the area over which the [Yankton] tribe might exercise its authority." Memorandum M–36783 from Associate Solicitor, Indian Affairs, to Commissioner of Indian Affairs 1 (Sept. 10, 1969), reprinted in App. 518.

and administrative materials utilized a convenient geographical description or reflected a considered jurisdictional statement. The mixed record we are presented with "reveals no consistent, or even dominant, approach to the territory in question," and it "carries but little force" in light of the strong textual and contemporaneous evidence of diminishment. *Rosebud, supra,* at 605, n. 27; see also *Solem,* 465 U. S., at 478 (finding subsequent treatment that was "rife with contradictions and inconsistencies" to be "of no help to either side").

## C

"Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that *de facto,* if not *de jure,* diminishment may have occurred." *Id.,* at 471. This final consideration is the least compelling for a simple reason: Every surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the "Indian character" of the reservation, yet we have repeatedly stated that not every surplus land Act diminished the affected reservation. See *id.,* at 468–469. The fact that the Yankton population in the region promptly and drastically declined after the 1894 Act does, however, provide "one additional clue as to what Congress expected," *id.,* at 472. Today, fewer than 10 percent of the 1858 reservation lands are in Indian hands, non-Indians constitute over two-thirds of the population within the 1858 boundaries, and several municipalities inside those boundaries have been incorporated under South Dakota law. The opening of the tribal casino in 1991 apparently reversed the population trend; the tribal presence in the area has steadily increased in recent years, and the advent of gaming has stimulated the local economy. In addition, some acreage within the 1858 boundaries has reverted to tribal or trust land. See H. Hoover, Yankton Sioux Tribal Land History (1995), reprinted in App. 545–546. Nonetheless, the area remains "predominantly populated by non-

Indians with only a few surviving pockets of Indian allotments," and those demographics signify a diminished reservation. *Solem, supra,* at 471, n. 12.

The State's assumption of jurisdiction over the territory, almost immediately after the 1894 Act and continuing virtually unchallenged to the present day, further reinforces our holding. As the Court of Appeals acknowledged, South Dakota "has quite consistently exercised various forms of governmental authority over the opened lands," 99 F. 3d, at 1455, and the "tribe presented no evidence that it has attempted until recently to exercise civil, regulatory, or criminal jurisdiction over nontrust lands." *Id.,* at 1456. Finally, the Yankton Constitution, drafted in 1932 and amended in 1962, defines the Tribe's territory to include only those tribal lands within the 1858 boundaries "now owned" by the Tribe. Constitution and Bylaws of the Yankton Sioux Tribal Business and Claims Committee, Art. VI, § 1.

## IV

The allotment era has long since ended, and its guiding philosophy has been repudiated. Tribal communities struggled but endured, preserved their cultural roots, and remained, for the most part, near their historic lands. But despite the present-day understanding of a "government-to-government relationship between the United States and each Indian tribe," see, *e. g.,* 25 U. S. C. § 3601, we must give effect to Congress' intent in passing the 1894 Act. Here, as in *DeCoteau,* we believe that Congress spoke clearly, and although "[s]ome might wish [it] had spoken differently, . . . we cannot remake history." 420 U. S., at 449.

The 1894 Act contains the most certain statutory language, evincing Congress' intent to diminish the Yankton Sioux Reservation by providing for total cession and fixed compensation. Contemporaneous historical evidence supports that conclusion, and nothing in the ambiguous subsequent treatment of the region substantially controverts our

reasoning. The conflicting understandings about the status of the reservation, together with the fact that the Tribe continues to own land in common, caution us, however, to limit our holding to the narrow question presented: whether unallotted, ceded lands were severed from the reservation. We need not determine whether Congress disestablished the reservation altogether in order to resolve this case, and accordingly decline to do so. Our holding in *Hagen* was similarly limited, as was the State Supreme Court's description of the Yankton reservation in *Greger*. See 510 U. S., at 421; *State* v. *Greger*, 559 N. W. 2d, at 867.

\* \* \*

In sum, we hold that Congress diminished the Yankton Sioux Reservation in the 1894 Act, that the unallotted tracts no longer constitute Indian country, and thus that the State has primary jurisdiction over the waste site and other lands ceded under the Act. Accordingly, we reverse the judgment of the Court of Appeals for the Eighth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*