# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2255

_____

Yankton Sioux Tribe,                        *

                                      *

     Plaintiff - Appellant,         *

                                        *   Appeal from the United States

    v.                              *   District Court for the

                                        *   District of South Dakota.

United States Army Corps of     *

Engineers, et al.,             *

                                        *

     Defendants - Appellees.    *

_____

Submitted: May 12, 2009
Filed: June 2, 2010

_____

Before LOKEN, Chief Judge,[*] BYE, Circuit Judge, and MILLER,[**] District Judge.

_____

LOKEN, Chief Judge.

An 1858 treaty between the United States and the Yankton Sioux Tribe of Native Americans established the Yankton Sioux Reservation (the "Reservation"), comprising approximately 430,000 acres in what is now Charles Mix County, South

---

[*]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[**]The Honorable Brian Stacy Miller, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Dakota, bounded on the south and west by the Missouri River. This appeal attacks the validity of land transfers by the U.S. Army Corps of Engineers to the State of South Dakota. It is resolved by our determination of the current boundaries of the Reservation. We deferred our ruling pending disposition of another appeal involving a different aspect of the long-standing dispute over the Reservation. We now follow our recent decision in Yankton Sioux Tribe v. Podhradsky, --- F.3d ---, 2010 WL 1791365 (8th Cir. May 6, 2010) (Podhradsky), and affirm.

## I.

Implementing the Dawes Act of 1887, federal agents "allotted" a substantial portion of the Reservation to individual tribal members in noncontiguous parcels. In 1892, federal Commissioners negotiated an agreement, ratified by Congress in 1894, whereby the Tribe ceded (transferred) 170,000 unallotted acres to the United States as surplus lands. Act of August 15, 1894, ch. 290, 28 Stat. 286 ("the 1894 Act"). As the 1892 agreement contemplated, the United States sold nearly all of the ceded lands, which were interspersed with allotted lands, to non-Indian settlers.

In South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998), the Supreme Court held that the Reservation was diminished by the lands ceded to the United States under the 1894 Act. However, the Court declined to determine whether Congress disestablished the Reservation altogether and remanded the case for further proceedings. Id. at 358. Since then, the remaining issues have been litigated in two separate lawsuits before District Judge Lawrence Piersol in the District of South Dakota and in multiple appeals to this court.

The lead case concerned the jurisdiction of the Tribe, the State of South Dakota, and the United States over non-ceded lands within the Reservation's original 1858 boundaries. Initially, we rejected the State's contention that the Reservation was disestablished by the 1894 Act, but we held that the Reservation was further

diminished when allotted lands passed out of Indian ownership. Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010 (8th Cir. 1999) ("Gaffey"), cert. denied, 530 U.S. 1261 (2000), rev'g in part 14 F. Supp. 2d 1135, 1159-60 (D.S.D. 1998). We remanded, instructing the district court to determine what categories of land comprised the diminished Reservation. Resolving appeals from that ruling, we recently held that the diminished Reservation consists of allotted lands that remain in trust, additional lands taken into trust, and ceded lands reserved by the 1894 Act ("agency trust lands"). Podhradsky, 2010 WL 1791365 at * 20, rev'g in part 529 F. Supp. 2d 1040 (D.S.D. 2007). The interested reader is referred to these opinions for a thorough review of the complex history and legal issues surrounding this critical part of the broad dispute.

This appeal concerns the second case arising out of the broad controversy. In the Flood Control Act of 1944, 58 Stat. 887, Congress authorized the Corps to construct dams along the Missouri River. The Corps acquired lands for this vast project by condemnation and purchase, including lands within the 1858 boundaries of the Reservation. In Title VI of the Water Resources Development Act of 1999, Congress directed the Corps to transfer to the State of South Dakota for fish and wildlife or public recreation uses specified lands "located outside the external boundaries of a reservation of any Indian Tribe" that the Corps had acquired to implement the Pick-Sloan Missouri River Basin project.[1] In this action, the Tribe seeks to nullify the sale to the State of recreation areas the Corps initially acquired for the Fort Randall Dam project in south-central South Dakota -- the 971-acre North Point Recreation Area and the 44-acre White Swan Recreation Area -- and the lease of the 70-acre Spillway Recreation Area. The Tribe argues that these lands are within

---

[1]Pub. L. No. 106-53, 113 Stat. 269, 391 §§ 605(b)(3), (c)(2) (1999), as amended by Pub. L. No. 106-541, § 540(h)(4), 114 Stat. 2572, 2670 (2000). These statutes have never been codified.

"the external boundaries" of the Reservation and are therefore barred from being transferred by §§ 605(b)(3) and (c)(2) of the WRDA, as amended.[2]

After first resolving the issue we remanded in <u>Podhradsky</u>, Judge Piersol granted summary judgment for the Corps and State. Noting the Tribe admitted that the Corps held title to the lands in question prior to enactment of the WRDA, Judge Piersol concluded that the lands here at issue do not fall within any of the categories of land which he determined in <u>Podhradsky</u> "continue to fall within the exterior boundaries of the checkerboard Yankton Sioux Reservation." <u>Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, No. 02-4126, 2008 WL 895830 at *3 (D.S.D. Mar. 31, 2008). The Tribe appeals. Reviewing the grant of summary judgment *de novo*, and applying the diminished Reservation boundaries adopted in <u>Podhradsky</u>, we affirm.

## II.

Because this appeal was briefed and argued with the cross appeals pending in <u>Podhradsky</u>, the parties have understandably reiterated their core positions in that case, namely, the Tribe's contention that the Reservation was diminished only by the sales of surplus lands ceded by the 1894 Act (as the Supreme Court held in <u>Yankton Sioux Tribe</u>), and the State's contrary contention that the Reservation was altogether disestablished by the 1894 Act. We rejected those contentions in <u>Podhradsky</u>. That decision is final (subject only to further review by this court or the Supreme Court) and binding on our panel. Therefore, we will discuss in this opinion only those issues raised by the Tribe that were not presented to and decided by the court in <u>Podhradsky</u>.

---

[2]We note that, in the 2000 WRDA, Congress amended § 605(d)(2)(B)(i)(II)(cc) to specifically direct the Corps to lease the Spillway Recreation Area to the State. 114 Stat. at 2666. Given our broader rejection of the Tribe's claims, we need not address whether this amendment foreclosed the specific Spillway claim.

1. The North Point, White Swan, and Spillway recreation areas here at issue consist of lands within the 1858 Reservation boundaries that were subsequently allotted to individual members of the Tribe.[3] Most parcels were then fee patented to allottees or their heirs and assigns and sold to non-Indians. Podhradsky held that the Reservation now consists of allotted land that remained in trust and other trust lands, but does not include allotted land that passed out of Indian hands. 2010 WL 1791365, at *20, applying Gaffey, 188 F.3d at 1030.[4] Thus, these fee-patented parcels were outside the Reservation's diminished boundaries *when the Corps acquired them.* The Tribe argues that Podhrasky decided only the jurisdictional status of these lands; they remain part of the Reservation because the Corps acquired the lands under the Flood Control Act of 1944, and we held in Lower Brule Sioux Tribe v. South Dakota, 711 F.2d 809, 813 (8th Cir. 1983), that the Flood Control Act did not authorize the diminishment of any reservation. However, as the district court recognized, the diminishment here did not result from Flood Control Act acquisitions. Rather, by reason of the 1894 Act as construed in Gaffey, these fee-patented lands were outside the "external boundaries" of the Reservation before they were acquired by the Corps. Therefore, the Corps' subsequent transfer of these lands to the State did not violate §§ 605(b)(3) and (c)(2) of the WRDA.

The Tribe also contends that summary judgment was inappropriate because there are material issues of fact whether the Corps acquired some tracts of allotted lands from non-Indians whose titles derived from fee patents that were forced upon

---

[3]Apparently, one 40-acre parcel was part of the lands ceded to the United States by the 1894 Act, in which case it is clearly outside the diminished Reservation.

[4]Typically, a reservation is diminished when a contiguous piece is carved out; while non-Indians may acquire title to land in the remainder, its reservation status does not change. See Solem v. Bartlett, 465 U.S. 463, 470-71 (1984). In Gaffey, however, we concluded that Congress intended the Reservation to be further diminished "by the loss of those lands originally allotted to tribal members which have passed out of Indian hands." 188 F.3d at 1030.

tribal members. Though presented as a diminishment issue, this is in fact a time-barred collateral attack on the validity of the titles the Corps acquired some sixty years ago. See Nichols v. Rysavy, 809 F.2d 1317 (8th Cir.), cert. denied, 484 U.S. 848 (1987). These lands were not within the Reservation when they were acquired for flood control purposes, nor when the Corps transferred them to the State.

2. A few tracts in the North Point and White Swan recreation areas were allotted land still held in trust for the benefit of allottees when they were acquired by the Corps in condemnation proceedings some sixty years ago. The record reflects that the Corps commenced condemnation proceedings in the District of South Dakota; the Bureau of Indian Affairs did not oppose condemnation but negotiated appropriate compensation for the Indian allottees; each allottee signed a Consent to Transfer of Lands acknowledging that, in exchange for specified compensation, "absolute fee title will be conveyed to the United States of America for the benefit of the War Department by court decree;" the district court then entered final condemnation orders; and the Attorney General provided the Secretary of the Army a letter opining that "valid title to the above tract is vested in the United States of America in fee simple." The Tribe concedes that the United States held fee simple title to these tracts when the WRDA was enacted and when the Corps transferred them to the State. See Cherokee Nation v. Southern Kansas Ry. Co., 135 U.S. 641, 656-657 (1890) (United States may use its eminent domain powers to take Indian lands); 25 U.S.C. §§ 341, 357. Moreover, any challenge to the takings would be time-barred. See 28 U.S.C. § 2401.

In Podhradsky, we held that allotments continuously held in trust for the benefit of the tribe or its members are part of the diminished Reservation. 2010 WL 1791365 at *13. However, we held in Gaffey that the Reservation was diminished "by the loss of those lands originally allotted to tribal members which have passed out of Indian hands." 188 F.3d at 1030. The Tribe argues that the district court erred in applying this ruling to the Corps' acquisition of such lands because Congress only "intended

to diminish the reservation by . . . land which it foresaw would pass into the hands of white settlers and homesteaders," id. at 1028, not to the United States.

This argument is without merit. First, the holding in Gaffey, which is binding on our panel, is not so limited. Second, a member of the Tribe who had a beneficial interest in allotted land still held in trust exchanged that interest for compensation when the land was acquired by the Corps in a condemnation proceeding, just as the same interest was surrendered by an allottee who took a fee patent and sold allotted land to a non-Indian.[5] Third, the Corps' use of the acquired land to build a dam and reservoir, which required the relocation of eight percent of the Tribe's population, was fundamentally inconsistent with the concept of a reservation -- "land set aside under federal protection for the residence or use of tribal Indians." Cohen's Handbook of Federal Indian Law § 3.04[2][c][ii], at 189 (2005 ed.). Our decision in Gaffey was that the transfer from Indian ownership diminished the Reservation, regardless of the identity of the transferee. Therefore, allotted lands still held in trust became lands "located outside the external boundaries" of the Reservation when fee simple title was acquired by the Corps for the Fort Randall Dam project.[6]

---

[5]The record reflects that individual tribal members were initially paid a total of $121,210 as compensation for the takings. In 1954, Congress authorized a payment of $106,500 "for the purpose of relocating the members of the Yankton Sioux Tribe, South Dakota, who reside or have resided, on tribal and allotted lands acquired by the United States for the Fort Randall Dam and Reservoir project." 43 U.S.C.A. § 1200e. In 2002, Congress placed an additional $23 million in a trust fund as compensation for the dam project. Yankton Sioux and Santee Sioux Tribes Equitable Compensation Act, Pub. L. No. 107-331, 116 Stat. 2834, 2838-2843 (2002)

[6]The Tribe also asserts that there may have been allotted land acquired by the Corps that had been continuously held in fee by tribal members, rather than non-Indians. Our decision in Podhradsky left open the Reservation status of lands falling in this category. 2010 WL 1791365 at *18. Without question, however, the Corps acquired fee title to these lands well before enactment of the WRDA.

## III.

Finally, the Tribe appeals the district court's denial of its motion to disqualify the Department of Justice from representing the Corps. The Tribe filed this motion in May 2007, almost five years after commencement of the suit, arguing that the Department should not represent the Corps in this case because its attorneys, representing the United States in its capacity as trustee, sided with the Tribe in the <u>Gaffey/Podhradsky</u> litigation. The Tribe cites no authority for the proposition that the Attorney General may be disqualified from performing his statutory duty of representing another department of the United States in federal court. 28 U.S.C. § 516. The district court did not abuse its discretion in denying this untimely motion. See <u>Droste v. Julien</u>, 477 F.3d 1030, 1035 (8th Cir. 2007) (standard of review).

The judgment of the district court is affirmed.

_____