*124 ORDER OF COURT REGARDING JURISDICTION
Defendants having moved for summary judgment declaring that this Court lacks jurisdiction; all parties having submitted briefs, argument, and exhibits regarding the same; the Court, having carefully considered the matter and being fully advised herein; and now, pursuant to SARCP Rule 17(1) and Fed.R.Evid. 201(b)(2), taking judicial notice of those historical documents provided by the Plaintiffs and Defendants to date;
FINDS, CONCLUDES AND ORDERS AS FOLLOWS:

*125
I.INTRODUCTION

Defendants DHS Drilling Company (“DHS”) and Encana Oil and Gas (USA) (“Encana”) filed motions to dismiss based upon lack of subject matter jurisdiction. Prior to a ruling, DHS filed an action for declaratory relief and a writ of prohibition in the United States District Court on August 24, 2009, also seeking to declare that this Court lacks jurisdiction. On January 6, 2010, the United States District court dismissed DHS’ action, ruling that the parties must exhaust Tribal Court remedies.
The cases against both Defendants were consolidated April 9, 2010. This Court denied Defendants’ motions to dismiss on jurisdictional grounds on May 20, 2010. On December 1, 2010, DHS filed a motion for summary judgment for lack of subject matter jurisdiction and the next day December 2, 2010, Encana filed a similar motion. The motions argue that the Wind River Indian Reservation, and specifically the parcel of land that is subject of the underlying allegations, was disestablished and as a result the Eastern Shoshone and Northern Arapaho Tribes (“Tribes”) lack authority to assert jurisdiction over non-Indian activity at the relevant locations.
These Findings and Conclusions rely upon the record as a whole, including documents and materials submitted by the parties herein of which the Court has taken judicial notice. The materials are voluminous and speak for themselves. The Court will not recite in this Order each of the documents individually but has reviewed and considered the materials.
Citations in the form of “BATES,” “BATES SHO” or “SHO” are to documents that are contained in the submissions of the parties and that have been given identifying numbers by those parties.
II. FINDINGS OF FACT:

Location of acts alleged against Defendants

1. Actions relevant to this matter took place at a site known as Tribal Muddy Ridge 19-24 BM well, within the exterior boundaries of the Wind River Reservation (“Reservation”) as established by the July 3, 1868 Treaty of Fort Bridger. (“1868 Treaty”), and lie within an area of the Reservation that was opened for settlement by the Act of March 3, 1905, 33 Stat. 1016 (1905) (“1905 Act”) (“1905 Act area”).
2. The map attached to the affidavit of Joshua Mann (“Wind River Reservation”) accurately depicts, for illustration purposes, the 1905 Act area in relation to the exterior boundaries of the Reservation, the City of Riverton, major watercourses, and reservation-based water rights awarded on the Wind River Reservation. (Mann Affidavit, NAT Supp. Exhibit 6).

Congressional Intent in the 1905 Act

3. In 1904, Inspector James McLaughlin had presented to the Eastern Shoshone and Northern Arapaho Tribes H.R. 13481, a proposed federal law designed to open certain portions of the Reservation to non-Indian settlement. In discussing the bill, Inspector McLaughlin assured Tribal members “that the unsold lands would belong to [the Tribes]” until they were sold. A proposed Agreement was negotiated and then submitted to Congress for approval. (BATES SHO 1367; BATES SHO 841.0; SHO 8402).
4. According to the records of the Congressional debates on the bill that was ultimately introduced, the Act would provide for “the opening to homestead settlement and sale under the town-site, coal-land, and mineral-land laws of about a million and a quarter acres in the Wind River Reservation in central western Wyo *126 ming.” In debating the effect of the opening on interests held by Asmus Boysen, Rep. Marshall stated:
The gentleman from New York [Mr. Fitzgerald] says that Mr. Boysen’s lease was canceled when the title passed from the Indians. True, there was a clause to the effect that when the lands were restored to the public domain this lease was canceled. The difficulty is, however, that these lands are not restored to the public domain, but are simply transferred to the Government of the United States as trustee for these Indians, and the clause which the gentlemen speaks of does not apply, and I think he knows it, as it was discussed in committee (NAT Supp. Exhibit 4, p. 6).
(BATES SHO 8543, SHO 0782). After the debates, the agreement negotiated by McLaughlin as unilaterally modified by Congress was adopted on March 3, 1905, and became the 1905 Act. (33 Stat. 1016, 10.1905.)
5. The Act as adopted deleted language in Articles II, III and IX of the 1904 Agreement obligating the United States to acquire outright Sections 16 and 36 in each township. These “school sections” are public lands granted to Wyoming in Section 4 of its Act of Admission to fund schools. (26 Stat. 222, 1890.) The Congressional debate indicates that the language referring to school lands was deleted so that the State could take “lieu lands”—federal lands granted to a state instead of school sections within reservations. (BATES SHO 1655.)
6. Rather than payment of a sum certain as was provided for in the earlier Lander and Thermopolis purchase agreements, (Lander Purchase Act, 18 Stat. 291 (1874)), the 1905 Act, Article II, provides that the United States would pay the Tribes “the proceeds derived from the sales of said lands.” Article IX of the 1905 Act provides that the ceded lands would continue to be held in trust by the United States for the Tribes until the lands were actually sold:
It is understood that nothing in this agreement contained shall in any manner bind the United States to purchase any portion of the land herein described or to dispose of said land except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the understanding that the United States shall act as trustee for said Indians to dispose of such lands and to expend for said Indians and pay over to them the proceeds received from the sale thereof only as received, as herein provided (33 Stat. 1016, 1020-21, 1905).

Implementation of the 1905 Act

7.Immediately after passage of the 1905 Act, the Office of the U.S. Surveyor General issued a contract for a survey required in the 1905 Act. The direction was to survey the opened lands of the Reservation. Plats produced as the result of the survey bear the legend “North Boundary Shoshone Indian Reservation” on the northern border of the opened area and “East Boundary Shoshone Indian Reservation” on the eastern border of the opened area. (BATES SHO 7623, SHO 7598, SHO 7584, BATES SHO 8871, SHO 8876).

The Historical Record—1905 to 1939

8. The historical materials cited or submitted by the parties and of which the Court has taken judicial notice document a broad-based view that the lands opened to settlement by the 1905 Act remained part of the Reservation. That perception is found in contemporaneous public sources, agency interpretations, Congressional actions and Court determinations.
*127 A. Contemporaneous sources. Local newspapers and official Wyoming publications, beginning immediately after the opening refer to the Reservation status of the opened lands. (BATES SHO 0797, BATES SHO 3079, BATES SHO 8552, BATES SHO 1253).
B. Agency interpretations.
i. Beginning shortly after passage of the 1905 Act, the Bureau of Indian Affairs began issuing grazing leases in the opened areas. BIA regulations allowed issuance of such grazing leases only on reservations where the United States agreed to dispose of the lands for the benefit of the Indians, but did not allow the leases on Reservations where the United States purchased and paid outright for the lands, thereby completely extinguishing Indian interests. Regulations Governing Use of Vacant Indian Lands, July 25, 1912. (BATES SHO 8212, SHO 0899, SHO 8375).
ii. In 1909, the Department of Interior affirmed that a railroad right-of-way through the opened lands to Hudson, Wyoming was to be made in accord with the Act of March 2, 1899, 25 U.S.C. § 312 et seq., applying to rights-of-way across Indian lands.
iii. In December 1933, the General Land Office proposed to sell certain lands that had been released from the Riverton irrigation project. The Office of Indian Affairs blocked the sale, stating: “Indian title to the land is not extinguished until it is disposed of and the Indians are paid therefor. The lands involved belong to the Indians ...” (BATES SHO 0922).
C. Congressional interpretations.
i.In 1916, Congress provided funds to enable the Office of Indian Affairs to advance the irrigation of the “Shoshone or Wind River Reservation, including the ceded lands of said reservation, in Wyoming.” 39 Stat. 123, 158 (1916). In response, the Secretary transmitted reports prepared by the Reclamation Service and the Indian Service. According to the Reclamation Service report, “[a] certain interest is retained by the Indians in the ‘ceded-lands’ portion of the reservation.” (BATES SHO 2343 at 2357).
ii. From 1917 into the 1940s, Congress made Indian appropriations for irrigation works on the “conditionally ceded” or “ceded portion of’ the Reservation. 39 Stat. 993 (1917). See, e.g. 46 Stat. 279, 293 (1930); 49 Stat. 176, 189 (1935); 53 Stat. 685, 702-03 (1939); 59 Stat. 318, 331 (1945.) Congress directed that a significant portion of such funds were to be reimbursed from Tribal proceeds under the 1905 Act.
iii. In 1920, Congress appropriated funds for the reclamation project in the opened area. Congress described the lands covered by the project as “within and in the vicinity of the ceded portion of the Wind River or Shoshone Reservation.” 43 U.S.C. § 597. The reclamation project withdrawal orders state “that the following described lands within the Shoshone Indian Reservation, Wyoming, excepting any tract the title to which has passed out of the United States, be withdrawn from public entry.” Letter, A.P. Davis to Secretary (Jan. 2, 1920) approved by John W. Hallo-well, Assistant to the Secretary (Jan. 3, 1920.) From January to September, 1920, all disbursements for this project were charged against the Indian appropriations. On October 1, 1920, the disbursements were made from the Reclamation fund. The net investment from the Reclamation fund and the Indian fund were combined into one item and carried under G.L. Account No. 190 as an “Indian investment.” (BATES SHO 1253).
*128 D. Court, determinations.
i. Early litigation likewise addressed the status of the opened lands. In January and February 1905, a railroad company applied for a right-of-way through the Wind River Canyon pursuant to the Act of March 2, 1899, 25 U.S.C. § 312 et seq., which dealt with rights-of-way across Indian lands. See Clarke v. Boysen, 39 F.2d 800 (10th Cir.), cert. denied, 282 U.S. 869, 51 S.Ct. 75, 75 L.Ed. 768 (1930). Even though the 1905 Act was enacted in March, the right-of-way was filed and approved on April 29, 1905, under the provisions of this statute governing Indian lands. See id. at 812.
ii. In United States v. Hampleman, Case No. 753 (D.Wyo. Sept. 5, 1913), the United States sought to enjoin the Wyoming State Engineer from trespassing or interfering with water use on individual allotments and other opened Reservation lands. (BATES SHO 2132). The District Court in Hampleman permanently enjoined the State from interfering with Indian diversions and trespassing on lands within the opened area, both off and on individual allotments. (BATES SHO 2132). In 1919, the State of Wyoming conceded Hampleman was still good law. (BATES SHO 1984, SHO 8981, BATES SHO 2217).

1939 Restoration Act.

9. A new national policy was implemented in 1934 which stopped further sale of opened lands and restored to Indian tribes full possessory interest in all undis-posed-of opened lands within Indian reservations. The policy was implemented through the Indian Reorganization Act (“IRA”). 25 U.S.C. § 461 et seq. Shortly after the IRA’s enactment, the Commissioner of Indian Affairs specifically recognized the Wind River Reservation as one of the reservations where Congress had intended lands to be restored to full tribal ownership within the 1905 Act area of the Reservation. The Commissioner distinguished reservations like Wind River from those where the exterior boundaries had been reduced. He explained:
During the early years of our dealings with the Indians, the custom was to have ... [them] relinquish or cede to the United States large areas claimed by them, for which there was usually a cash or other consideration ... In this way the Indians lost all identity with the ceded areas and their rights and interest therein were recognized as having been completely extinguished. In many instances such cessions, taken as a whole, embraced practically all of the lands now comprising many of the states of the west ... This brings us up to the period of about 1890, at which time there was adopted the plan of opening to entry, sale, etc. the lands of reservations that were not needed for allotment, the Government taking over the lands only as trustee for the Indians.
Only lands within existing reservations were to be restored to full tribal ownership. (BATES SHO 0924).
10. Restoration of undisposed-of Reservation land was effectuated as part of legislation enacted on July 27, 1939 (“1939 Act”), distributing proceeds from Shoshone Tribe v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937), Act of July 27, 1939, 25 U.S.C. §§ 571-581. During testimony concerning the bill, Wyoming’s Senator O’Mahoney engaged in an exchange with Assistant Commissioner of Indian Affairs Zimmerman regarding the land provisions of the 1939 Act:
Senator O’Mahoney. What land is it proposed to purchase?
Mr. Zimmekman. It is proposed to purchase principally white-owned lands *129 within the ceded portion of the reservation.
Senator O’Mahoney. In other words, it is proposed to repurchase for the Indians some of those lands which years ago the Indians ceded to the Government in trust for settlement by whites?
Mr. Zimmerman. That is correct.
(BATES SHO 2708).

Boysen and Anchor Dam Acts.

11. In 1944, Congress enacted the Flood Control Act, 58 Stat. 887 (1944), which approved the construction of several reservoirs in the Missouri River Basin including the Boysen Reservoir on the Wind River. In the Act of July 18, 1952 (“Boy-sen Act”), 66 Stat. 780 (1952), Congress authorized the Secretary of the Interior to “convey and relinquish” to the United States “the property and rights” of the Tribes “needed by the United States for the construction and maintenance and operation” of the Boysen project. According to the Secretary of the Interior, at the time of the Boysen Act, the Tribes had three types of interests in the lands affected by the Act: (1) occupancy rights in tribal lands; (2) beneficial rights in lands conditionally ceded by the 1905 Act as defined by the Supreme Court in Ash Sheep v. United States, 252 U.S. 159, 166, 40 S.Ct. 241, 64 L.Ed. 507 (1920); and (3) rights in lands acquired under the 1939 Act. (BATES SHO 3039 at 3042). The “conveyances and relinquishments” authorized by the Act were acquired by the United States in accordance with a memorandum of understanding between the Bureau of Reclamation and the BIA approved on December 29, 1951, and amended on May 1, 1952. See 66 Stat. 780 (1952).
12. The Memorandum of Understanding adopted by Congress specifically provided that a portion of the payment was for power and railroad rights-of-way “over the Wind River reservation lands.” (BATES SHO 3039 at 3044.) Boysen reservoir is located in the 1905 Act area (Mann Affidavit).

The 1958 Act.

13. By March 31, 1953, a patchwork of approximately 332,000 acres had been withdrawn for the Riverton reclamation project. Of these 332,000 acres, only about 100,000 acres had been disposed of to settlers. (BATES SHO 3338). Between 1920 and 1953, many miles of canals, roads and other infrastructure were constructed on the unsold lands. Unsold lands were flooded by project reservoirs and various entities extracted tons of sand, gravel and other building materials from these lands. The Tribes had not been compensated for any of these unauthorized uses of the unsold land. (BATES SHO 3293, SHO 3156).
14. In 1953, the Interior Department proposed legislation to compensate the Tribes and to open additional lands within the reclamation project to non-Indian settlement.
15. Under Section 1 of the Act of August 15, 1953, 67 Stat. 592 (1953) (“1953 Act”), Congress provided the Tribes with approximately $1 million to “be deemed to constitute full, complete, and final compensation, ... for terminating and extinguishing all of the right, title, estate, and interest, including minerals, gas and oil, of said Indian tribes and their members of, in and to lands [and] interests in lands.” 67 Stat. 592, 595 (1953).
16. The remainder of Section 1 describes an approximately 225,000 acre tract which was the new boundary of the reclamation project within the Reservation. Id. at 613-14. In Section 5, Congress directed the Secretary to deposit in the Treasury, to the credit of the Tribes, 90 percent of the gross receipts from the *130 lease or other disposition of the minerals on the tract of lands described in Section 1. Id. at 614.
17. Of the 161,000 surface acres of land purchased by the 1953 Act, approximately 105,000 acres were never patented (including the lands involved in this case in Section 19) and remain in federal surface ownership today and consequently are under federal jurisdiction.
18. To resolve issues arising out of the 1953 Act and the decision of U.S. ex rel. the Shoshone Indian Tribe v. Seaton, 248 F.2d 154 (D.C.Cir.1957), cert. denied, 355 U.S. 923, 78 S.Ct. 366, 2 L.Ed.2d 353 (1958), Congress passed “A bill relating to minerals on the Wind River Indian Reservation in Wyoming, and for other purposes” on August 27, 1958. 72 Stat. 935 (1958) (“1958 Act”). The 1958 Act “declared” that the Tribes owned “all of the right, title and interests in all minerals, including oil and gas, the Indian title to which was extinguished” by the 1953 Act. The 1958 Act also restored to Tribal ownership those federal minerals reserved by the government when other lands within the project area had been patented under the 1905 Act. (BATES SHO 3342). It provided that the minerals underlying the Riverton project area would be leased under the 1938 Indian Mineral Leasing Act, 25 U.S.C. § 396a et seq., which governs mineral leases in Indian country and provided that all of the gross proceeds of such leases would be credited to the Tribes, rather than 90 percent as provided for in the 1953 Act. When considering the 1958 Act for passage, the Committee on Interi- or and Insular Affairs, described the lands as “within the Riverton reclamation project within the Wind River Indian Reservation ...” (BATES SHO 3342).
19. In 1975, Congress established the American Indian Policy Review Commission. 88 Stat. 1910 (1975). In 1976, the Commission issued a report that classified various cession acts into those that involved an outright cession of land and those that simply opened the reservation for settlement. U.S. Senate Select Committee on Indian Affairs, Meetings of the American Indian Policy Review Commission, Vol. 2, Tables B and C (Feb. 20, May 8-9,1976.) The 1905 Act is listed as being within the category of statutes that simply opened the reservation to settlement. Id. at Table C.

Continuing recognition of exterior boundaries in the Federal Courts.

20. In 1975, the U.S. Supreme Court described the Reservation as “[ljoeated in a rather arid portion of central Wyoming, at least some of its 2,300,000 acres have been described by Mr. Justice Cardozo as ‘fair and fertile.’ ... It straddles the Wind River, with its remarkable canyon, and lies in a mile-high basin at the foot of the Wind River Mountains.” United States v. Mazurie, 419 U.S. 544, 546, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) citing Shoshone Tribe 299 U.S. at 486, 57 S.Ct. 244. The Wind River Canyon is in the opened area of the Reservation.
21. In 1980, the federal courts again referenced the exterior boundary. Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes, 623 F.2d 682, 683 (10th Cir. 1980) (“The reservation is large and the town of Riverton and other settlements are within its boundaries. There are a large number of patented tracts owned in fee by non-Indians not including the property in Riverton.”) cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847, reh’g denied, 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981).
22. In 1987, the federal courts found the reservation “encompass[ed] nearly 1.9 million acres and ranges in altitude from 4,200 to over 13,000 feet.” Northern *131 Arapahoe Tribe v. Model, 808 F.2d 741, 744 (10th Cir.1987). According to the Court, “the lowest point on the Reservation is the Wind River Canyon at 4,200 feet which is at the northernmost border of the Reservation.” Id.
23. Shoshone and Arapaho Tribes v. United States, 364 F.3d 1339 (Fed.Cir.2004) is the Tribes’ breach of trust case against the United States for mismanagement of mineral resources and trust funds. The Federal Circuit describes the current reservation as follows:
Both Tribes continue to occupy the Wind River Reservation, which consists primarily of the reservation lands created by the Treaty of 1868, minus certain lands sold to the United States in 1872 and 1896. Id. at 1343.
24. The events relevant to jurisdiction set forth in the Jorgenson and Northern Arapaho Complaints occurred within the exterior boundaries of the Wind River Reservation.

Defendants’ activities on the Reservation.

25. All of the producing fields operated by Encana are located north of the Big Wind River and east of the Popo Agie River, in the 1905 Act area of the Wind River Reservation. (Flagg Affidavit, NAT Supp. Exhibit 1).
26. Encana has paid mineral royalties to the Tribes for its oil and gas leases, including leases in T4N, R3E, Section 19, W.R.M., the location of TMR 19-24 BM. Of the total mineral royalty revenue for natural gas received by the Tribes, Enca-na’s payment has been 59.81% of that total between January 1, 2001, and December 31, 2010, and Encana’s payment has been 69.05% of that total between January 1, 2007, and November 30, 2010. Between January 1, 2001, and December 31, 2010, Encana’s payment to the Tribes has averaged $678,270.00 per month. (Flagg Affidavit, NAT Supp. Exhibit 1).
27. Encana has paid severance taxes to the Tribes for the development of oil and gas, including oil and gas in T4N, R3E, Section 19, W.R.M. Over a ten-year period, Encana has paid severance taxes to the Tribe in the amount of $56,993,201.64. (Flagg Affidavit, NAT Supp. Exhibit 1).
28. In 2009 and prior years, each Defendant executed agreements with the Tribal Employment Rights Office (TERO), which provide, inter alia, that their operations take place “upon the Wind River Indian Reservation” and that they shall comply with the provisions of the S & A LOC, Title X (TERO) (NAT Complaint, Exhibit D). Each has paid all TERO fees through 2009 and each has likewise paid an annual business license issued by the Tribes under S & A LOC 14-17-1 et, seq. (NAT Complaint, Exhibit E). Said license may be denied or revoked if, inter alia, the proposed business “would pose a danger to the health or welfare of reservation residents” or would be inconsistent with tribal laws.
29. Defendants have not challenged or otherwise argued that the Tribes’ severance taxes on minerals developed at well 19-24 are beyond tribal authority. “The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management ... it derives from the tribe’s general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction,” Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (emphasis added).
*132 III. CONCLUSIONS OF LAW
1. The threshold jurisdictional question is whether the location at issue in this case is within the exterior boundaries of the Wind River Reservation or is otherwise subject to the regulatory authority of the Tribes. In answering this question, the Court must determine whether the 1905 Act disestablished the area of the Reservation where the well in question is located.
2. Beginning in the last 1800s and carrying through the first decades of the 1900s, Congress adopted surplus land acts opening many tribal reservations in the western United States to non-Indian settlement. The specific terms of these laws varied and often it was not clear whether a particular act was intended to completely extinguish all tribal interests in the subject land, to “disestablish” that portion of the reservation.
3. Defendants urge that the Wind River Reservation was “diminished” rather than “disestablished” and that there is an important distinction between the two terms, citing usage of “diminished” by agencies and courts in support of their arguments. Usage of the terms common in a disestablishment analysis has not been consistent and intended meanings may vary. Typical usage suggests that the portion of the Reservation not affected by a surplus land act is the diminished portion, the affected area is the ceded portion and if the cession extinguished all tribal interests in the area, there is a disestablishment of the ceded area. No presumption attaches to the use of these words.
4. Courts have considered disestablishment issues in a number of contexts and have set out guidelines for analysis of the issues presented. According to the rulings, only Congress can disestablish a reservation, and its intent must be clear and plain. United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909); United States v. Dion, 476 U.S. 734, 738-39, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986). In addition, “[o]nee a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise,” Solem v. Bartlett, 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). The “effect of any given surplus land act depends on the language of the act and the circumstances underlying its passage.” Solem, 465 U.S. at 469, 104 S.Ct. 1161.
5. “When both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to dimmish Indian lands, [the courts] are bound by traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening.” Solem, 465 U.S. at 472, 104 S.Ct. 1161 (emphasis added); accord: South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 344, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) (courts will resolve ambiguities in favor of Indians and not lightly find disestablishment).
6. Words must be construed in the manner that the Indians would have understood them and ambiguities in statutes and agreements must be resolved in the Indians’ favor. Minnesota v. Mille Lacs Band, 526 U.S. 172, 200, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999); Choctaw v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). In reservation disestablishment cases, the rule that “legal ambiguities are resolved to the benefit of the Indians” must be given “the broadest possible scope.” DeCoteau v. Dist. County Court, 420 U.S. 425, 447, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); see also *133 Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Celestine, 215 U.S. at 290, 30 S.Ct. 93. These canons of construction are rooted in the trust relationship between the United States and the Indians, as well as the fact that many agreements and statutes were imposed on Indians who had no choice but to consent. See, e.g., Choctaw Nation v. United States, 119 U.S. 1, 28, 22 Ct.Cl. 476, 7 S.Ct. 75, 30 L.Ed. 306 (1886); Jones v. Meehan, 175 U.S. 1, 11, 20 S.Ct. 1, 44 L.Ed. 49 (1899).
7. To the extent that the language of the act and the circumstances underlying its passage are equivocal on the question of congressional intent to disestablish, post-enactment events also may be considered, although they are of “lesser” significance. Salem, 465 U.S. at 471, 104 S.Ct. 1161. Among the factors to consider are whether there was a “widely held, contemporaneous understanding” that disestablishment was intended; the manner in which Congress treated “the affected areas, particularly in the years immediately following the opening, has some eviden-tiary value,” as does both the manner in which other agencies and judicial authorities dealt with the lands and also the actual subsequent settlement history of the lands. Solem, 465 U.S, at 471-472, 104 S.Ct. 1161.
8.Prior to the 1905 Act, there had been two purchases of Reservation land by the United States, the Lander Purchase and the Thermopolis Purchase, (30 Stat. 62, 93, 1897). In both of those instances, the government had clearly negotiated a land sale with a sum certain payment. Based on the circumstances, including the contrast with these earlier agreements, the contingent payment provisions and the specific representations made by Inspector McLaughlin, the Indians at the time would not have understood the 1904 Agreement to have been a disestablishment.
9. The record of the Congressional debates and the final language of the Act itself are inconsistent with an intent by Congress to disestablish the 1905 Act area. Instead, the debates and language of the Act provide substantial, compelling and unambiguous evidence that Congress did not intend disestablishment.
10. It is presumed that Congress will exercise its Indian trust responsibilities in “perfect good faith,” Lone Wolf v. Hitchcock, 187 U.S. 553, 568, 23 S.Ct. 216, 47 L.Ed. 299 (1903), and therefore Congress presumptively acted in accord with the assurances given during the negotiations and the Tribal understandings of the proposed agreement.
11. Moreover, a conclusion that Congress did not intend disestablishment is substantially supported by the facts of contemporaneous understandings and subsequent federal agency and Congressional actions. Defendant Encana has pointed in particular to a 1912 map and a later Solicitor’s opinion as evidence supporting its interpretation. However, maps marshaled to address disestablishment issues have limited interpretive value. South Dakota v. Yankton Sioux Tribe, 522 U.S. at 356, 118 S.Ct. 789, and the overwhelming weight of evidence is to the contrary of Defendants’ position. If later actions do suggest ambiguity in the original Congressional action, those ambiguities must be resolved in favor of the Tribes.
12. Applying the standards set out by the United States Supreme Court and evaluating the 1905 Act in light of those standards, this Court concludes that Congress did not intend to, and therefore did not, disestablish the affected area by the 1905 Act.
*134 13. Likewise, evaluating later Congressional actions in light of the same standards, this Court concludes that subsequent Congressional actions have not evinced an unequivocal Congressional intent to completely divest tribal interests in lands within the exterior boundaries of the Reservation as they existed after the Lander and Thermopolis purchases.
14. Defendants have argued that the Act of August 15, 1953, 67 Stat. 592 (“1953 Act”) operated to disestablish that part of the Reservation within the subject reclamation area. This Court concludes that if did not.
15. Section 1 of the Act, in part, describes a line which is the new boundary of the reclamation project after passage of the 1953 Act, rather than a change to the Reservation boundary, as is clear from subsequent Congressional actions.
16. Congress in 1956 acquired land within the Wind River Indian Reservation for Anchor Dam reclamation reservoir on the Reservation and provided for payment from the Missouri River Basin project with reclamation funds. 70 Stat. 987 (1956) (“Anchor Dam Act”). Congress recognized that the project included “irrigable lands of the Shoshone and Arapaho Tribes of the Wind River Reservation.” On December 3, 1986, thirty (30) years later, the United States confirmed that the Anchor Dam Act did not alter the Reservation status of the land when it transferred a portion of the lands back to the Tribes under the Federal Property and Administrative Services Act 40 U.S.C. § 521 et seq. formerly 40 U.S.C. § 472 et seq. (“Excess Property Act”).
17. The Act of August 27, 1958, 72 Stat. 935 (1958) (“1958 Act”) was passed in direct response to the Seaton Court’s interpretation of the 1953 Act in a manner contrary to Congressional intent. The 1958 Act and its legislative history establish that Congress did not intend to divest the Tribes of all interests in the land and instead intended for the Tribes to retain all interests in the mineral estate as to the subject lands.
18.The 1958 Act provides that the minerals “shall be administered and leased in accordance with” the 1938 Indian Minerals Leasing Act (IMLA), 25 U.S.C. § 396a et seq., which is applicable in Indian country. The 1958 Act in § 1 makes clear that all leases, irrespective of the original statutory authority under which they was issued, were to be administered under the IMLA.
19. In support of their disestablishment arguments, Defendants cite Yellowbear v. State, 174 P.3d 1270 (Wyo.2008), which held that the 1905 Act disestablished the Reservation. However, that decision is not controlling here. “The field of federal Indian law has been centrally concerned with protecting Indian tribes from illegitimate assertions of state power over tribal affairs.” Handbook of Federal Indian Law, 2005 Ed., Cohen § 2.01[2]. States lack authority to determine the treaty rights of Indian tribes without an express waiver of federal and tribal sovereign immunity and acquiescence by Congress. Without these special circumstances, State court rulings regarding the scope of “Indian country” are entitled to little deference and neither preclusive nor stare decisis effect. Seymour v. Superintendent, 368 U.S. 351, 353-55, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962).
20. The Yellowbear Court incorrectly cited In re: The General Adjudication of All Rights to Use Water in the Big Horn River System and All Other Sources, 753 P.2d 76 (Wyo.1988) (“Big Horn I”) as having decided that the 1905 Act disestablished the Reservation. The Court takes judicial notice of the Wyoming State court *135 records in Big Horn, I pursuant to SARCP Rule 17(1) and Fed.R.Evid. 201(b)(2). Review of the record makes clear that the effect of the 1905 Act was raised and was fully and fairly litigated to finality. Determination of the boundaries of the Wind River Reservation, including the reservation status of the 1905 Act area, was a necessary prerequisite to the determination and award of 1868 treaty-based water rights within those boundaries. This determination was also necessary to the decree’s limitation on where such rights could be used.
21. In the case, Reservation-based, 1868 treaty priority date water rights were finally adjudicated to certain lands within the exterior boundaries of the Wind River Reservation, including lands within the 1905 Act area. Of these, “Walton” rights have been awarded on 4,655 acres within the 1905 Act area. “Walton” rights are not awarded on lands outside the exterior boundaries of a Reservation. See Mann Affidavit; Judgment and Decree on Remand—Walton Type Claims, In re the General Adjudication of All Rights to Use Water in the Big Horn, River System, Civil No. 77-4493/ 86-0012 (Mar. 11, 2004). In Big Horn I, the court determined that the 1905 Act remains “Indian country” and a part of the Wind River Reservation. This proceeding was only permissible in state court because of the MeCarran Amendment, 43 U.S.C. § 666, a federal law adopted by-Congress to allow for state court adjudication of water rights by waiving federal sovereign immunity and it is only because of the specific statutory proceedings that Big Horn, I has precedential import.
22. Beyond arguing that the relevant area has been disestablished, Defendants Encana and DHS primarily rely on the ruling in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), (“Montana”) and its progeny in support of their arguments against Tribal jurisdiction in this case. However, that line of cases applies to non-Indian activity on fee lands within reservations. The ease before this Court does not involve any activity on non-Indian fee land. Instead, the locations at issue are within the exteri- or boundaries of the Reservation, are held in trust by the United States for the Tribes, who are beneficial owners of the mineral estate, which is dominant over ownership interests in the surface. The Tribes also have an equitable interest in return of the surface estate to them pursuant to the Excess Property Act.
23. Even if the Montana “test” were applicable, the Court would have jurisdiction to hear the complaints. Encana and DHS have voluntarily entered into commercial dealings and “consensual relations” with the Tribes. Encana’s oil and gas Lease, both Defendants’ TERO agreements, business license agreements, and payment of Tribal severance taxes all amply demonstrate sufficient consent under that prong of the Monta,na “test.” Plaintiff Jorgenson, who was placed originally at the worksite as a TERO trainee, is directly within that class of persons to whom provisions of the agreements regarding workplace safety apply. The contract claims of the Northern Arapaho Tribe go directly to the interpretation and enforcement of those very agreements which form the basis for Defendants’ commercial dealings and “consensual relations” with the Tribes.
24. This case can have a substantial effect on the health and safety of tribal members like Jeremy Jorgenson and others. The regulation of liquor, especially the prohibition against use by under-age individuals, is critical to the health and safety of those who consume it or may be put at risk because of its consumption by *136 others. The regulation of workplace safety, especially in the development of tribal energy resources, is also of central concern to the Tribes. Finally, the activities of Encana and DHS have a substantial effect on the economic security and the political integrity of the Tribes. Tribal revenue from mineral royalties and severance taxes is substantial. This revenue allows the Tribes to provide important governmental services throughout the Reservation. As has been recognized in Encana v. Whitlock, No. 09-CV-124-D (D.Wyo. 2009) “the funds derived from Encana’s development of the Tribe’s energy resources have an obvious impact on the ‘political integrity, the economic security, or the health or welfare of the tribe.’ ... Encana’s activities clearly affect the Tribes’ economic security as well as its health and welfare.”
WHEREFORE, IT IS HEREBY ORDERED:
1. This Court rules that the relevant site in Section 19 is within the exterior boundaries of the Wind River Reservation. This ruling is final and binding on the parties.
2. If Montana applies, Plaintiffs have made a prima facie case that the claims asserted are based on consensual relationships between the Defendants and the Tribes and that important and substantial health and safety concerns of the Tribes as well as economic and political interests are implicated.
Defendants’ motions for summary judgment for lack of jurisdiction are DENIED.