# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-3718

_____

United States of America,

      Plaintiff - Appellee,

v.

Joseph Joshua Jackson,

      Defendant - Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   District of Minnesota.
\*
\*
\*

_____

Submitted: May 18, 2012
Filed: October 2, 2012

_____

Before LOKEN and BEAM, Circuit Judges, and PERRY,* District Judge.

_____

LOKEN, Circuit Judge.

    Joseph Joshua Jackson, an Indian, was charged with brutally assaulting Danielle King in Redby, Minnesota, a town within the original boundaries of the Red Lake Indian Reservation. The district court denied Jackson's motion to dismiss the indictment, concluding as a matter of law that the alleged assault occurred within the boundaries of the Reservation and therefore in "Indian country." United States v. Jackson, Crim. No. 10-151, Report and Recommendation (D. Minn. Aug. 5, 2010), adopted by Order dated Aug. 23, 2010. Jackson then entered a conditional plea of

_____

*The Honorable Catherine D. Perry, Chief Judge of the United States District Court for the Eastern District of Missouri, sitting by designation.

guilty to assault with a dangerous weapon, 18 U.S.C. §§ 113(a)(3) and 1153(a), and to discharging a firearm during the commission of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii). The plea agreement provided that Jackson may appeal the order denying his motion to dismiss and, if he prevails, "may withdraw his plea." Reviewing this issue *de novo*, we conclude the district court made its Indian country ruling on an inadequate record and remand with directions to permit Jackson to withdraw his guilty plea. We therefore need not address Jackson's additional contention that the court imposed a substantively unreasonable sentence.

## I.

The federal government has jurisdiction over major crimes committed by Indians in Indian country, including assault with a dangerous weapon. 18 U.S.C. § 1153(a). As this is an element of the offense, the government has the burden to prove that a crime was committed in Indian country. United States v. Jewett, 438 F.2d 495, 497 (8th Cir. 1971). "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a).[1] Jackson argues the assault occurred on land that Congress conveyed to the Minneapolis, Red Lake and Manitoba Railway Company in a 1905 statute that diminished the Red Lake Reservation ("the 1905 Act"), depriving the district court of subject matter jurisdiction because "the situs of the offenses is no longer a part of the reservation." United States v. Wounded Knee, 596 F.2d 790, 792 (8th Cir.), cert. denied, 442 U.S. 921 (1979); see Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1030 (8th Cir. 1999), cert. denied, 530 U.S. 1261 (2000).

---

[1] § 1151(b) and (c) broaden the definition of Indian country, but the government in this appeal relies exclusively on § 1151(a).

Indian reservation lands are owned by the United States and held in trust for the benefit of specific tribes or bands. "Congress can unilaterally alter reservation boundaries." Hagen v. Utah, 510 U.S. 399, 404 (1994), citing Lone Wolf v. Hitchcock, 187 U.S. 553, 567-68 (1903). In 1887, responding to tribal financial difficulties and westward migration of white settlers, Congress enacted the General Allotment Act (known as the Dawes Act), ch. 119, 24 Stat. 388, which authorized allotments of reservation land to individual Indians and the sale of surplus, unalloted reservation land to non-Indians. See Mattz v. Arnett, 412 U.S. 481, 496-97 (1973). In modern times, the Supreme Court has decided seven cases raising the question whether various surplus lands Acts diminished or entirely terminated particular reservations. In three cases, the answer was no. Solem v. Bartlett, 465 U.S. 463, 481 (1984); Mattz, 412 U.S. at 506; Seymour v. Supt. of Wash. State Pen., 368 U.S. 351, 356 (1962). In the other four, including the most recent two, the answer was yes. South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 358 (1998); Hagen, 510 U.S. at 521; Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 614-15 (1977); DeCoteau v. Dist. Cnty. Ct., 420 U.S. 425, 445 (1975).

In its most recent decision, Yankton Sioux Tribe, 522 U.S. at 343-44, a unanimous Court summarized the relevant inquiry:

> [I]f a surplus land Act simply offered non-Indians the opportunity to purchase land within established reservation boundaries, then the entire opened area remained Indian country. Our touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose. Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be clear and plain.
>
> . . . . Our inquiry is informed by the understanding that, at the turn of [the twentieth] century, Congress did not view the distinction between

acquiring Indian property and assuming jurisdiction over Indian territory as a critical one . . . . Congress naturally failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation. Thus, although the most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands, we have held that we will also consider the historical context surrounding the passage of the surplus land Acts, and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there. Throughout this inquiry, we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment. [Citations and quotations omitted.]

Unlike <u>Yankton Sioux Tribe</u> and the other six Supreme Court decisions, this case does not involve a surplus lands Act. Rather, like <u>Wounded Knee</u>, 596 F.2d at 792-93, which involved Flood Control Act takings, the 1905 Act authorized a sale of reservation land for a purpose other than opening surplus land to white settlers, namely, railroad improvement. And unlike <u>Wounded Knee</u>, the sale at issue here was to a private party, the railroad, not to an agency of the federal government. Nevertheless, as in <u>Wounded Knee</u>, we conclude the issue is governed by the above-quoted principles developed by the Supreme Court in surplus lands Act cases.

## II.

The Red Lake Band of Chippewa Indians once occupied thirteen million acres of land in northwestern Minnesota. Pursuant to an 1863 treaty, the Band ceded approximately ten million acres to the United States, reserving a distinct tract of over three million acres. The reserved land became known as the Red Lake Reservation. <u>See</u> <u>United States v. White</u>, 508 F.2d 453, 456-57 & nn. 3, 4 (8th Cir. 1974). In the half-century following the 1863 treaty, the Red Lake Band ceded two additional large portions of Reservation land to the United States. First, the Nelson Act of January 14, 1889, ch. 24, 25 Stat. 642, implemented the Band's agreement to "grant, cede, relinquish, and convey to the United States all [their] right, title, and interest in and

-4-

to" over two million acres.  Second, in a 1902 agreement ratified by the Act of February 20, 1904, ch. 161, 33 Stat. 46, the Band agreed to "cede, surrender, grant, and convey to the United States all claim, right, title and interest in and to" over 250,000 additional acres of the Reservation.

Although the 1889 and 1904 Acts provided for allotment of the remaining Reservation land to individual Indians, the Band successfully resisted allotment; tribal members today continue to hold nearly all Reservation land communally.  See Nord v. Kelly, 520 F.3d 848, 858 (8th Cir. 2008) (Murphy, J., concurring); State v. Lussier, 130 N.W.2d 484, 486 (Minn. 1964).  In Minnesota Indian country, the federal government's jurisdiction over major crimes is exclusive only within the modern boundaries of the Red Lake Reservation.  See 18 U.S.C. § 1162(a), (d).

We deal here with a different type of statute.  By mid-1903, the Secretary of the Interior had granted the Minneapolis, Red Lake and Manitoba Railway Company a narrow right-of-way to operate a railroad through a portion of the Red Lake Reservation, as authorized by the Act of March 2, 1899, ch. 374, 30 Stat. 990 (now codified at 25 U.S.C. § 312).  The 1905 Act was enacted, after the railroad began operations, "to enable [the railroad] to acquire some more land for further terminal facilities."  39 Cong. Rec. 1854 (1905).  The Act provided in relevant part:

> *Be it enacted* . . . That there is hereby granted to the Minneapolis, Red Lake and Manitoba Railway Company . . . its successors and assigns, owning and operating . . . a line of railroad in the State of Minnesota, having its northern terminus at a point on the shore of Lower Red Lake, Minnesota . . . in the Red Lake Indian Reservation, as more particularly shown upon a map of definite location approved by the Secretary of the Interior . . . the right to select and take from the lands of the Red Lake Indian Reservation grounds adjacent to its northern terminus . . . not to exceed in extent three hundred and twenty acres.

Sec. 2.  That before titles to said lands shall vest in the said railway company, and before said company shall occupy or use said lands, compensation therefor shall be made to the tribes of Indians residing upon the said reservation and to any individual occupant of any said lands.  The amount of compensation . . . shall be . . . determined in such manner as the Secretary of the Interior may direct and be subject to his final approval.

Sec. 3.  That said company shall file maps . . . showing the definite location of the grounds so selected and taken, which said maps shall be subject to the approval of the Secretary of the Interior; but no right of any kind shall vest in said railway company . . . until the maps showing the same shall have been approved by the Secretary of the Interior and until compensation aforesaid shall have been fixed and paid.

Sec. 4.  That the right herein granted shall be forfeited by said company unless the maps showing the grounds authorized to be taken . . . shall be filed and compensation aforesaid made within one year after the passage of this Act.

Sec. 5.  The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of intoxicating liquors in the Indian country, shall be in full force and effect throughout the territory hereby granted, until otherwise directed by Congress or the President of the United States, and for that purpose said tract shall be held to be and to remain a part of the diminished Red Lake Indian Reservation.

Act of February 8, 1905, ch. 556, 33 Stat. 708. Following the Act's passage, the railroad selected and purchased for $6,816.20, with the Secretary of the Interior's approval, 300.5 acres of Reservation land (excluding the railroad's prior right-of-way) in present-day Redby; for unexplained reasons, the Department of the Interior denied the railroad's application for a patent covering this land.  See Ann. Rep. of the Dept. of the Interior for Year Ended June 30, 1905, H.R. Rep. Doc. No. 59-5, at 93 (1906).

In his motion to dismiss the indictment, Jackson argued that the Act diminished the Red Lake Reservation, relying primarily on the "select and take from" language in Section 1, and Section 5's liquor prohibition and reference to "the diminished Red Lake Indian Reservation." As the incident occurred on land in Redby that was removed from the Reservation, Jackson argues, the alleged offenses did not occur in Indian country, and the federal government lacked jurisdiction to prosecute. In support, Jackson submitted documents showing that some Redby properties are privately owned and Beltrami County tax assessments on Redby properties. In response, the government argued that private ownership does not eliminate federal jurisdiction, Congress in the 1905 Act had not clearly diminished the Red Lake Reservation, and the court "can take judicial notice that Redby is within the reservation boundary."

Precisely where the alleged offenses occurred is a disputed fact, but for purposes of this appeal, it is undisputed they occurred on privately owned land in Redby. The record on appeal does not include document(s) conveying title of the 300.5 acres from the United States to the railroad, nor any information concerning the subsequent ownership history of the land conveyed. Neither party provided probative evidence regarding the current Indian character of the land. The State of Minnesota has exercised no criminal jurisdiction over this land since the Supreme Court of Minnesota held that it remained Indian country in <u>Lussier</u>, 130 N.W.2d at 488.[2]

The magistrate judge's Report and Recommendation noted the absence of evidence relating to the subsequent ownership and treatment of the land granted under the 1905 Act. The court concluded that neither the 1905 Act nor its sparse legislative history "evince any clear congressional intent to diminish the Red Lake Reservation" because the "select and take from" language in Section 1 refers only to a change of

---

[2]<u>Lussier</u>'s interpretation of federal law, while relevant extrinsic evidence under <u>Yankton Sioux</u>, obviously does not control our interpretation of a federal statute.

ownership, and Section 5's liquor prohibition is inconclusive standing alone. Therefore, the alleged offenses occurred in Indian country even if committed on privately owned land in Redby.

### III.

The issue on appeal is whether the 1905 Act diminished the boundaries of the Red Lake Indian Reservation. In response to Jackson's motion to dismiss, the district court resolved this issue in the government's favor, prior to trial, as a matter of law, and on a minimal factual record, without discussing the propriety of doing so. Construing an ambiguous statute is no doubt an issue of law (though we do not decide that question). But even if it is, if statutory ambiguity requires consideration of extrinsic evidence under the Supreme Court's diminishment jurisprudence, then ruling that the offenses occurred in Indian country as a matter of law based on a record consisting of little more than the statute's text was prejudicial error.

Turning to the merits of the issue, the Supreme Court's surplus lands Act decisions instruct us to look first to the language of the 1905 Act, mindful that diminishment is not lightly presumed. See United States ex rel. Condon v. Erickson, 478 F.2d 684, 689 (8th Cir. 1973) ("a holding favoring federal jurisdiction is required unless Congress has *expressly or by clear implication* diminished the boundaries of the reservation") (emphasis in original). When a surplus lands Act provides that a Tribe cedes its entire interest in land to the United States for a sum certain, "a nearly conclusive, or almost insurmountable, presumption of diminishment arises." Yankton Sioux, 522 U.S. at 344 (quotations omitted). As previously described, the 1899 and 1904 Acts contained such provisions and thus "clearly diminished" the Red Lake Reservation. Red Lake Band v. Minnesota, 614 F.2d 1161, 1162 & n.2 (8th Cir.), cert. denied, 449 U.S. 905 (1980); United States v. Minnesota, 466 F. Supp. 1382, 1385 (D. Minn. 1979). By contrast, Section 1 of the 1905 Act granted a private

railroad the right to "select and take" up to 320 acres of "grounds adjacent to its northern terminus" on the Red Lake Reservation.

The district court concluded that Section 1, on its face, like the surplus lands Acts in <u>Mattz</u>, <u>Seymour</u>, and <u>Solem</u>, "simply provided that parcels of land, within the respective Reservations, could be sold to non-Indians," and therefore "does not even suggest, let alone 'present an explicit expression of,' congressional intent to diminish the Red Lake Reservation." <u>Jackson</u>, Rept. & Rec. at 15, quoting <u>Solem</u>, 465 U.S. at 476. Our difficulty with this analysis is that it ignores the distinct context of the 1905 Act -- relations between the federal government, railroads, and Indian tribes.

During the nineteenth century, to foster development of the western United States, Congress acted to aid the construction of railroads through grants of public lands to companies that would commit to building railroads and telegraph lines. <u>See, e.g.</u>, Act of July 1, 1862, ch. 120, 12 Stat. 489, relating to construction of the trans-continental railroad; Act of Mar. 3, 1875, ch. 152, 18 Stat. 482, generally delegating to the Secretary of the Interior authority to grant public lands to railroads. The Act of Mar. 2, 1899, extended the Secretary's authority to grant railroad rights-of-way to include rights-of-way "through any Indian reservation in any State or Territory." Indian consent was not a necessary prerequisite to these grants.

Rights-of-way are typically easements that do not convey fee title and may be limited to a specific use or purpose. Thus, the Act of Mar. 3, 1875, gave the Secretary authority to grant railroad rights-of-way through public lands "to the extent of one hundred feet on each side of the central line of said road." Section 2 of the Act of Mar. 2, 1899, limited the Secretary's authority to grant rights-of-way through Indian reservations to "fifty feet in width on each side of the center line," or one hundred feet "where there are heavy cuts and fills." And Section 2 of the Act of Feb. 28, 1902, ch. 134, 32 Stat. 43, granting a right of way through Indian Territory in Oklahoma, was even more limited, authorizing the railroad "to take and use for all purposes of a

railway, and for no other purpose, a right of way one hundred feet in width . . . and when any portion thereof shall cease to be so used such portion shall revert to the nation or tribe of Indians." We would not construe a statute granting land for this type of railroad right-of-way as diminishing the reservation through which the line will run, even if the railroad is built in accordance with the grant, later abandoned, and the railroad or its successor in interest retains title to the right-of-way land after it is no longer used for railroading.[3]

But our conclusion that a railroad right-of-way would not diminish an Indian reservation does not resolve the issue in this case. Congress in these statutes granting rights-of-way conveyed even more land to the railroads. For example, in the Act of July 1, 1862, the grant included "all necessary grounds for stations, buildings, [etc.]," § 2, plus "every alternate section of public land . . . to the amount of five alternate sections per mile on each side of said railroad," § 3. In the Act of Mar. 3, 1875, the grant included "the right to take, from the public lands . . . ground adjacent to such right of way for station-buildings, depots [etc.] not to exceed in amount twenty acres for each station, to the extent of one station for each ten miles of its road." And § 2 of the Act of Mar. 2, 1899, provided that a grant of Indian reservation land "may include ground adjacent [to the right-of-way] for station buildings, depots [etc.] not to exceed one hundred feet in width by a length of two thousand feet, and not more than one station to be located within any one continuous length of ten miles of road."

The 1905 Act did not grant the railroad a right-of-way; as the legislative history makes clear, the railroad already had its right-of-way and was operating. The words

---

[3]This conclusion is consistent with the express inclusion of rights-of-way in the boundaries of an Indian reservation as defined in 18 U.S.C. § 1151(a). However, it may be uncertain whether this 1948 statute could have restored to reservation status land conveyed for a railroad right-of-way in a prior act of Congress that reflected the requisite "clear and plain" intent to diminish a reservation. We suspect that interesting question will never need to be litigated.

"select and take from" in Section 1 of the 1905 Act mirror and were obviously derived from earlier Acts granting lands in addition to rights-of-way to railroads.  See Stalker v. Or. Short Line R.R., 225 U.S. 142, 148-50 (1912).  The absence of a "sum certain" in the 1905 Act is of no significance because inclusion of a sum certain, often feasible in surplus lands Acts, was replaced in these railroad statutes, with no change in substance, by requiring the Secretary of the Interior to price the land selected *and to collect the determined price for the benefit of the Indians before conveying land to the railroad*.  And it was well-established by 1905 that, upon approval of the railroad's selection by the Secretary, "the grounds so selected were segregated from the public lands" and "withdraw[n] . . . from the market."  Id. at 153.  The analysis of Section 1 in this railroading context does not establish that it is "language evidencing the present and total surrender of all tribal interests,"  Solem, 465 U.S. at 470.  But it puts the question of congressional intent-to-diminish far more in doubt than the district court acknowledged.

We look next at the liquor prohibition in Section 5.  As Jackson plausibly argues, the prohibition was unnecessary if the Act did not diminish the Reservation because the Act of July 23, 1892, ch.234, 27 Stat. 260-61, already prohibited the introduction and sale of intoxicating liquors in Indian country.  See Yankton Sioux, 522 U.S. at 350-51; Rosebud Sioux, 430 U.S. at 613 n. 47.[4]  Adding to that inference is the language Congress used in Section 5 to impose the liquor prohibition -- the land selected and taken by the railroad "shall . . . remain a part of *the diminished Red Lake Indian Reservation*" for the purpose of enforcing the "laws of the United States . . . prohibiting the introduction and sale of intoxicating liquors in the Indian country" (emphasis added).  Just one year earlier, in the Act of 1904, Congress had used the

---

[4]On the other hand, because non-Indian ownership was a more significant factor in that era, Congress in 1905 may have believed (or been concerned) that the 1892 Act would not apply to land conveyed to the railroad whether or not the conveyance diminished Reservation boundaries.  See Bates v. Clark, 95 U.S. 204, 208-09 (1877); Gaffey, 188 F.3d at 1024.

term "diminished reservation" five times in provisions that clearly referred to the Red Lake Reservation *as diminished by that Act*.  See Art. I, Art. IV, Art. VI § 3. Although it is possible to construe "the diminished reservation" in Section 5 of the 1905 Act as referring to the Reservation as diminished by the 1904 Act, it is far more plausible to conclude that Congress used the term consistently in the two statutes, in which case "the diminished reservation" in Section 5 refers to the Reservation as diminished *by the 1905 Act*.  Cf. Mattz, 412 U.S. at 504 & n.22.[5]

Based on this broader statutory review, we conclude that Section 1 and Section 5 of the 1905 Act do not provide clear and plain evidence of congressional intent to diminish the Red Lake Reservation's boundaries by the grant of this rather substantial Reservation acreage to expand the railroad's terminal facilities.  Thus, the district court properly denied Jackson's motion to dismiss the indictment.  But the text of the statute gives considerable indication of an intent to diminish, and the diminishment issue appears never to have been considered in the context of a congressional grant of land beyond the minimum needed for a railroad's right-of-way.

With the statute's text and legislative history inconclusive, Supreme Court precedents mandate consideration of "the historical context surrounding the passage of the [1905 Act], and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there."  Yankton Sioux, 522 U.S. at 344 (quotations omitted); see also the additional factors discussed in Hagen, 510 U.S. at 420-21; Solem, 465 U.S. at 471-72; and Rosebud Sioux, 430 U.S. at 604-05.  Here, the government, having the burden to prove this element of the offense, failed to come forward with extrinsic evidence of these additional factors that would permit a court to conclude, as a matter of law, that the reservation was not diminished by the 1905

---

[5]Another question making proper interpretation of Section 5 even more uncertain is whether the 1905 Congress in referring to the diminished reservation was "referring to diminishment in common lands and not diminishment of reservation boundaries."  Solem, 465 U.S. at 475 n.17, citing Erickson, 478 F.2d at 687.

Act.  Therefore, on this record, the district court erred in precluding Jackson's Indian country defense.  In these circumstances, we conclude that Jackson should be granted an opportunity to withdraw his guilty plea, consistent with his conditional plea agreement.

The judgment of the district court is vacated and the case is remanded for further proceedings not inconsistent with this opinion.

_____