# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1789

_____

United States of America

*Plaintiff - Appellee*

v.

Joseph Joshua Jackson

*Defendant - Appellant*

------------------------------

Red Lake Band of Chippewa Indians

*Amicus on Behalf of Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: October 19, 2016
Filed: April 4, 2017

_____

Before LOKEN, SMITH,[*] and COLLOTON, Circuit Judges.

_____

---

[*]The Honorable Lavenski R. Smith became Chief Judge of the United States Court of Appeals for the Eighth Circuit on March 11, 2017.

LOKEN, Circuit Judge.

Joseph Joshua Jackson, an Indian, was charged with committing federal felony offenses in the town of Redby, Minnesota, historically part of the Red Lake Indian Reservation. The Major Crimes Act grants federal jurisdiction over these offenses when committed by Indians "within the Indian country," 18 U.S.C. § 1153(a), including the Red Lake Reservation, see 18 U.S.C. § 1162(a).  Jackson moved to dismiss, arguing the district court lacked subject matter jurisdiction because a 1905 Act of Congress diminished the Red Lake Reservation, removing the town of Redby from Indian country.  After the district court denied his motion to dismiss, Jackson conditionally pleaded guilty and appealed that ruling.  Concluding the record did not adequately support the district court's determination that Redby is part of Indian country as a matter of law, we vacated the district court's order, allowed Jackson to withdraw his guilty plea, and remanded for further proceedings.  United States v. Jackson, 697 F.3d 670, 678 (8th Cir. 2012) ("Jackson I").

On remand, the parties agreed to resolve the issue of subject matter jurisdiction before Jackson decided whether to withdraw his plea.  After an extensive evidentiary hearing, the district court[1] again denied the motion to dismiss and subsequently entered final judgment sentencing Jackson to 136 months in prison.  Jackson appeals the order denying his motion to dismiss, again arguing that the 1905 Act diminished the Red Lake Reservation and removed Redby from Indian country.  Whether an act of Congress diminished or disestablished an Indian reservation is a question of statutory interpretation we review *de novo*.  See, e.g., Nebraska v. Parker, 136 S. Ct. 1072, 1079 (2016).  We agree with the district court that the 1905 Act did not diminish the Red Lake Reservation.  Accordingly, we affirm.[2]

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

[2]In the district court, the parties did not agree on the location in Redby where Jackson committed the offenses.  The court determines whether a particular piece of

# I. Background.

**A.** The term "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C. § 1151(a). As we explained in Jackson I, Congress can unilaterally alter reservation boundaries, and in modern times the Supreme Court has decided a series of cases "raising the question whether various surplus lands Acts [in the late nineteenth and early twentieth centuries] diminished or entirely terminated particular reservations." 697 F.3d at 672. We summarized the relevant inquiry, quoting from South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343-44 (1998). Last year, the Supreme Court confirmed that this remains the relevant inquiry:

> Only Congress can divest a reservation of its land and diminish its boundaries, and its intent to do so must be clear. To assess whether an Act of Congress diminished a reservation, we start with the statutory text, for the most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands. Under our precedents, we also examine all the circumstances surrounding the opening of a reservation. . . . [M]any surplus lands Acts did not clearly convey whether the opened lands retained reservation status or were divested of all Indian interests. For that reason, our precedents also look to any unequivocal evidence of the contemporaneous and subsequent understanding of the status of the reservation by members and nonmembers, as well as the United States and the State [where the reservation is located].

---

land is in Indian country; the jury then decides whether the crime in fact occurred on that land. See United States v. Roberts, 185 F.3d 1125, 1139 (10th Cir. 1999); United States v. Stands, 105 F.3d 1565, 1575-76 (8th Cir. 1997). Our conclusion that the 1905 Act did not diminish the Reservation fully resolves the Indian country issue.

Parker, 136 S. Ct. at 1078-79 (citations and quotations omitted). Congress' intent to "alter the terms of an Indian treaty by diminishing a reservation . . . must be clear and plain." Yankton Sioux Tribe, 522 U.S. at 343 (citations and quotation omitted). Although the 1905 Act here at issue was not a surplus lands act, we adhere to our ruling in Jackson I that this issue of diminishment is governed by the principles "developed by the Supreme Court in surplus lands Act cases." 697 F.3d at 673.

**B.** The Red Lake Reservation resulted from an 1863 Treaty between the United States and the Red Lake and Pembina Bands of Chippewa Indians. Two subsequent acts of Congress significantly reduced the Reservation's boundaries. The Nelson Act of January 14, 1889, 25 Stat. 642 ("1889 Act"), provided that the Red Lake Band will "cede, relinquish, and convey" over two million acres to the United States. The Act of February 20, 1904, 33 Stat. 46 ("1904 Act"), ratifying a 1902 agreement, stated that the Band "cede[d], surrender[ed], grant[ed] and convey[ed]" more than 250,000 acres to the United States. Redby is located six miles inside the Red Lake Reservation's present-day exterior boundary.

The 1889 and 1904 Acts were passed during the so-called "allotment era," in which Congress passed surplus lands acts that allotted tribal lands to individual Indians and sold surplus lands to white settlers, reflecting Congress' nationwide policy to promote Indian assimilation and accommodate settlers' westward expansion. See Solem v. Bartlett, 465 U.S. 463, 466 (1984). These Acts provided that the Red Lake Band ceded its entire interest in the surrendered lands, creating "a nearly conclusive, or almost insurmountable, presumption of diminishment." Jackson I, 697 F.3d at 675 (quotation omitted). Though the 1889 Act mandated the sale of "allotted lands in severalty to the Red Lake Indians on Red Lake Reservation," 25 Stat. 642, 643, the Red Lake Band successfully resisted allotment. Congress in the 1904 Act removed mandatory allotment language, stating Band members "shall be entitled" to allotments. 33 Stat. 46. As late as June 1928, the Secretary of the Interior reported that "it has not yet been found to be practicable to allot the Red Lake Reservation."

U.S. Court of Claims, Report of the Commissioner No. H-76 at 96 (April 2, 1934) ("H-76 Report"). Red Lake has remained a "closed" reservation, meaning almost all lands are held communally, "apparently one of only two reservations in the nation to enjoy this status." Nord v. Kelly, 520 F.3d 848, 858 n.7 (8th Cir. 2008) (Murphy, J., concurring).

**C.** During this period, Congress also actively promoted railroad development by granting railroad rights-of-way through various Indian reservations. In 1899, Congress passed a law enabling railroad companies to obtain rights-of-way, but limiting the amount of land that could be granted. See Act of March 2, 1899, 30 Stat. 990. In 1903, the Red Lake Transportation Company converted a temporary logging permit into a permanent railroad right-of-way extending through part of the Red Lake Reservation into modern day Redby. In 1904, the Minneapolis, Red Lake and Manitoba Railway Company ("MRL&M"), having acquired the Red Lake Transportation Company's interests, petitioned Congress for additional lands surrounding the existing terminal to establish a lumber-shipping hub near Redby. See H. R. Rep. No. 3542 (1905). On February 8, 1905, Congress passed the statute here at issue, entitled an Act to Allow the Minneapolis, Red Lake, and Manitoba Railway Company to Acquire Certain Lands in the Red Lake Reservation ("1905 Act"). The 1905 Act provided, as relevant here:

> *Be it enacted* . . . That there is hereby granted to the Minneapolis, Red Lake and Manitoba Railway Company[,] . . . a line of railroad . . . having its northern terminus at a point . . . in the Red Lake Indian Reservation[,] . . . the right to select and take from the lands of the Red Lake Indian Reservation grounds adjacent to its northern terminus . . . not to exceed in extent three hundred and twenty acres.
>
> Sec. 2. That before title to said lands shall vest in the said railway company, and before said company shall occupy or use said lands, compensation therefor shall be made to the tribes of Indians residing upon the said reservation . . . . The amount of compensation for said

-5-

lands shall be ascertained and determined in such manner as the Secretary of the Interior may direct and be subject to his final approval.

Sec. 3. That said company shall file maps . . . showing the definite location of the grounds so selected and taken, which said maps shall be subject to the approval of the Secretary of the Interior . . . .

Sec 5. The laws of the United States now in force, or that may hereafter be enacted, prohibiting the introduction and sale of intoxicating liquors in the Indian country, shall be in full force and effect throughout the territory hereby granted, until otherwise directed by Congress or the President of the United States, and for that purpose said tract shall be held to be and to remain a part of the diminished Red Lake Indian Reservation.

Sec. 6. That Congress reserves the right to alter, amend, or repeal this Act or any part thereof.

MRL&M timely selected 312.09 acres where the town of Redby is today, including 11.59 acres that formed its existing right-of-way. The Secretary of the Interior determined fair compensation to the Band, and MRL&M paid $6,816.20 in damages. MRL&M next sought a patent for the 312.09 acres to evidence its title. The Secretary denied the request because the 1905 Act did not include a patent provision and title was fully vested by the railroad's compliance with the 1905 Act. Eventually, MRL&M abandoned the rail line, and in 1939 the Band began to restore the 312.09 acres into trust to benefit the Band, including through a $5,000 payment to the railroad. The United States now holds approximately 95% of the land MRL&M acquired under the 1905 Act in trust for the benefit of the Band.

**D.** In <u>Jackson I</u>, we noted that Indian country includes "rights-of-way running through the reservation," 18 U.S.C. § 1151(a), but the 1905 Act "did not grant the railroad a right-of-way. . . . [T]he railroad already had its right-of-way and was operating." 697 F.3d at 676. Though the 1905 Act did not provide that the Band

"ceded" its interest in the 312 acres, language creating a "nearly conclusive" presumption of diminishment, Section 1 allowed the railroad to "select and take from" the lands of the Reservation, language "obviously derived from earlier Acts granting lands in addition to rights-of-way to railroads." Id. In addition, Section 1 granted the railroad more land than the minimum needed for a right-of-way, and Section 5 contained a liquor prohibition that was "unnecessary if the Act did not diminish the Reservation" and that referred to "the diminished Red Lake Indian Reservation." Id. at 676-77. We considered the 1889 Act and the 1904 Act, and we noted the distinct railroading context of the 1905 Act. Jackson I, 697 F.3d at 673-77. We concluded the text of the 1905 Act did not provide "clear and plain evidence of congressional intent" to diminish the Red Lake Reservation, but these provisions contained "considerable indication of an intent to diminish." Id. at 677.

Under the Supreme Court's relevant inquiry, this textual ambiguity mandated consideration of extrinsic evidence -- "the historical context surrounding the passage of the surplus land Acts and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there." Yankton Sioux Tribe, 522 U.S. at 344 (quotation omitted). Unequivocal historical evidence establishing a "widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation" may support a finding of diminishment, even where the statutory language is ambiguous as to Congressional intent. Solem, 465 U.S. at 471. Yet the record on appeal included only the 1905 Act, a single floor statement in the Act's legislative history stating that it extends a railroad's existing right-of-way, 39 Cong. Rec. 1854, a comparison to the 1904 Act, and documents that Jackson submitted showing that Beltrami County assesses taxes against some lots in Redby. On this spotty and inconclusive record, we concluded the government had not met its burden to present evidence permitting a court to "conclude, as a matter of law, that the reservation was not diminished by the 1905 Act." Jackson I, 697 F.3d at 679.

## II. Proceedings on Remand.

On remand, the parties and the Red Lake Band of Chippewa Indians, appearing as *amicus curiae* on behalf of the government, presented substantial testimony, exhibits, and briefing to address these issues at a two-day evidentiary hearing. Ian Smith, a Project Historian at Historical Research Associates, testified for the government regarding Congress's intent in passing the 1905 Act, based on his research summarized in a comprehensive report, A Study of the Act of February 8, 1905, and Its Impact on the Red Lake Indian Reservation, Minnesota. Researching the period from the late 1880s to the late 1910s, Smith reviewed the Congressional Record, including U.S. House and Senate floor statements and Committee Reports regarding the 1905 Act and its 1910 amendment; government reports and records from the Bureau of Indian Affairs, the Department of the Interior, and the Bureau of Land Management; annual reports of the Commissioner of Indian Affairs from 1897-1912; National Archives records; Congressional reports related to the Red Lake Reservation and legislation impacting the Reservation; Narratives and Statistical Reports by the Superintendent of Red Lake Agency from 1911-1922; and secondary sources regarding railroad development on reservation lands. Based on his review of these records, Smith concluded, "The record was fairly clear . . . from a historical perspective that the documents leading up to and subsequent to the passage of these laws didn't show evidence of lands being ceded from the Reservation or lands being diminished or boundaries being changed."

The Red Lake Band as amicus curiae filed a post-hearing brief that expanded on this historical record. The Band provided Congressional records of negotiations that preceded the 1889 and 1904 Acts and a 1934 report of the Commissioner of the Court of Claims. These sources described the Band's successful resistance to Congress' mandatory allotment policy, which resulted in Congress using permissive allotment language in the 1904 Act, further evidence, the Band contended, that Congress did not intend to diminish this unique Reservation in the 1905 Act. The

Band also presented evidence addressing the government's subsequent treatment of the area, the current Indian character of Redby, the importance of the area to the Red Lake Reservation, and the residents' expectations of the Band's continued authority.

Other government witnesses addressed the subsequent treatment and current character of the Redby area -- Harlan Beaulieu, a Red Lake Realty Officer; Debra Glynn, co-owner of the Redby One Stop in Redby; Janet Beaulieu, Assistant Director of the Red Lake Housing and Finance Corporation; and Captain Dana Lyons from the Red Lake Department of Public Safety. Jackson presented three witnesses who testified to the current character and the extent of state and local government involvement in Redby -- Judy Kay Lussier, co-owner of the Redby One Stop; Charlene Sturk, Beltrami County Recorder; and Thomas Westbrook, owner of the Redby Store.

After a comprehensive review of the record, the district court on remand found that the statutory language read in historical context shows that Congress did not intend to diminish the reservation through the 1905 Act. Further, while the record regarding the subsequent treatment of the land was somewhat mixed, the district court found the government presented more compelling evidence of the land's retained Indian character. It concluded that the government presented sufficient extrinsic evidence to show that Congress intended the 1905 Act to extend MRL&M's existing right-of-way rather than remove that land from the Red Lake Reservation.

## III. Analysis.

On appeal, both parties represent that there is little disagreement, if any, over the facts in the record. The parties dispute whether these facts support a conclusion of diminishment such that Jackson's offenses did not occur in Indian country. The parties and the Band as *amicus* quite properly focus, primarily, on the text of the 1905 Act, read in its historical context, and particularly on the evidence presented on

-9-

remand addressing the provisions in the 1905 Act that we noted as possible indicators of Congressional intent to diminish.  See Jackson I, 697 F.3d at 677.

**A.  Issues Relating to Statutory Text.**  Jackson first argues that differences between the 1905 Act and contemporary right-of-way acts suggest that the 1905 Act was a land cession instead of an extension of MRL&M's existing right-of-way.  He notes that the 1905 Act does not use the term "right-of-way" in its title or text, unlike contemporary right-of-way acts.  And unlike right-of-way acts, the 1905 Act gave MRL&M the right to acquire title to land that it would "select and take," without limiting its permitted use of the land.

Historian Smith's report and testimony addressed this issue at length.  He compared the 1905 Act to five right-of-way acts passed between 1888 and 1900 affecting the Red Lake Reservation, or land ceded in the 1889 Act.  These other acts similarly allowed railroad companies to "take" lands alongside their rights-of-way. See Act of April 17, 1900, 31 Stat. 134 (granting a right-of-way and stating "railroad company may take not exceeding forty acres in addition to the grounds allowed for station purposes for the corresponding section of ten miles" for railroading purposes); Act of October 1, 1890, 26 Stat. 660 (granting right-of-way and "the right to take and use one hundred and sixty acres of the lands in said reservation [to] be held for general railway uses and purposes only").  Smith opined that similarities between the 1905 Act and these earlier right-of-way acts suggest that Congress did not intend to diminish the Red Lake Reservation.  The Red Lake Band argues that Section 6 of the 1905 Act, which was not referenced in Jackson I, incorporated language frequently used in right-of-way statutes.

Though the 1905 Act was not explicitly a right-of-way statute, Smith's research suggests that Congress intended the 1905 Act as an extension of MRL&M's existing right-of-way.  During House floor debate on February 3, 1905, Representative Steenerson characterized the purpose of the bill to "extend [MRL&M's] right of way,

so as to give it further terminals." 39 Cong. Rec. 1854. Representative Clapp made similar reference to a right-of-way during debate regarding a 1910 Amendment to the 1905 Act. 45 Cong. Rec. 2554. A House of Representatives report presented the bill as an Act to allow MRL&M to "acquire certain lands in the Red Lake Indian Reservation in Minnesota for purposes of a proper terminus." H. R. Rep. No. 3542 (1905). Jackson notes that the House Report included a letter in which the Acting Commissioner of Indian Affairs questioned whether Indian consent "should be obtained [prior] to the cession or grant of land." Id. But, as the Report also stated, "grants for rights of way and station grounds to railroad companies through and upon Indian lands" are typically made without such consent. Id. The Commissioner's reference to "cession or grant" is of little probative value, as one term suggests intent to diminish, the other does not. The "tenor" of the legislative record suggests Congress intended the bill that became the 1905 Act to simply extend MRL&M's right-of-way. See Yankton Sioux Tribe, 522 U.S. at 351-52.

Jackson further argues that the provision for compensation in Section 2 of the 1905 Act indicates diminishment because "an unconditional commitment from Congress to compensate the Indian tribe for its opened land," combined with use of cession language, creates a presumption of diminishment. Yankton Sioux Tribe, 522 U.S. at 344 (quotation omitted). But historian Smith's research revealed that some contemporaneous right-of-way acts included provisions similar to the 1905 Act, requiring the Secretary of the Interior to approve plat maps, conduct appraisals, and accept damage payments for the Band. See Act of April 24, 1888, 25 Stat. 90. The record reflects that MRL&M paid $6,816.20 in damages for the value of 300.5 acres that was not already "property of the railroad" (its existing right-of-way), and for "Indian improvements" on the proposed townsite. As the Band notes, this method of compensation suggests that Congress intended to compensate members for an expansion of the railroad's existing right-of-way.

Jackson renews his argument that the reference to "the diminished Red Lake Indian Reservation" in Section 5 "supports a finding that the 1905 Act diminished the reservation." However, after reviewing government reports, contemporary laws, congressional documents, and archival records, historian Smith concluded that, by 1905, "diminished Red Lake Indian Reservation" had become a term of art government officials used in referring to the Reservation as diminished by earlier surplus lands acts, rather than by the 1905 Act itself. Smith cited references to the term in 1892, 1896, and 1902 compiled for a 1935 Court of Claims case, see H-76 Report at 92-93, 95, 98; government maps of the "diminished Red Lake Indian Reservation" after 1905; and the testimony of Red Lake Realty Officer Harlan Beaulieu at the evidentiary hearing.

Jackson again argues that the liquor prohibition in Section 5 is clear evidence of intent to diminish because the provision would otherwise be unnecessary. On remand, the government presented evidence that Congress passed other statutes with liquor prohibitions redundant to a general prohibition of liquor on reservations, see Act of July 23, 1892, 27 Stat. 260; that Congress was greatly concerned with the problem of alcohol abuse on reservations; and that Minnesota Congressman Steenerson presented Section 5 as a last minute amendment to address this concern.

Finally, Jackson argues that a 1910 amendment to the 1905 Act that was not part of the record in Jackson I demonstrates Congressional intent to diminish. Recall that in 1905, the Secretary of the Interior denied MRL&M's request for a land patent because the 1905 Act did not include a provision for a patent and because title to the land was vested by the railroad's compliance with the 1905 Act. But MRL&M persevered. In 1910 it obtained an amendment to the 1905 Act providing that "[t]he Secretary of the Interior shall cause a patent for the land selected and taken to be issued to said company . . . to show the title vested in the company . . . ." Act of June 25, 1910, 36 Stat. 855, 861. Issued in 1916, the patent granted MRL&M the land "together with all the rights, privileges, immunities, and appurtenances, of whatsoever

-12-

nature, thereunto belonging, unto the said [MRL&M], and to its successors and assigns forever."

Neither the 1910 amendment nor the 1916 patent demonstrates congressional intent to diminish the Red Lake Reservation in the 1905 Act. See 18 U.S.C. § 1151(a); Solem, 465 U.S. at 465 n.1, 470. Moreover, the 1910 amendment's legislative history, though scant, supports the conclusion that Congress viewed the 1905 Act as akin to a right-of-way act. MRL&M's attorney, Mr. Babbitt, initially requested the patent in a 1905 letter to the Commissioner of Indian Affairs "for the lands in the Red Lake Indian Reservation." During Senate debate on the amendment, Senator Moses Clapp explained the company preferred that "a patent shall issue to the company for the right of way." 45 Cong. Rec. 2554.

On balance, we agree with the district court that the text of the 1905 Act, read in light of its legislative history, leans heavily in favor of the government's position. Most significantly, the 1905 Act differed markedly from the 1889 and 1904 Acts that were viewed as diminishing the Reservation -- the 1889 Act used the terms "cede, relinquish, and convey," 25 Stat. 642, and the 1904 Act used the language "cede, surrender, grant, and convey," 33 Stat. 46. As the Band notes, the 1889 and 1904 Acts transferred large areas of land by explicit terms of cession, language Congress did not use in the 1905 Act when it granted the railroad a "small island" six miles within the Reservation. Indeed, the different language in these earlier Acts, and the legislative history suggesting an intent merely to expand MRL&M's right-of-way, confirm the lack of clear and plain Congressional intent to diminish. See Parker, 136 S. Ct. at 1080.

**B. The Historical Context.** Because Congress in this era often did not clearly convey whether transferred lands retained reservation status, the Supreme Court "also look[s] to any unequivocal evidence of the contemporaneous and subsequent understanding of the status of the reservation." Parker, 136 S. Ct. at 1079 (quotation

-13-

omitted). Once again, the record on remand extensively addressed this factor. As the record overall is inconclusive, we agree with the district court that it fails to show express or clear Congressional intent to diminish the Red Lake Reservation.

Jackson argues that the backdrop against which Congress legislated -- an era of allotment and assimilation -- indicates diminishment, because Congress pursued a nationwide policy of acquiring Indian lands. But diminishment analysis focuses on the historical context and language of the particular statute at issue. See Solem, 465 U.S. at 469 (explaining that some surplus land acts diminished reservations, while some did not). Here, we agree with the district court that the record shows a history of successful resistance to allotment by the Red Lake Band that formed part of broader policy decisions and actions taken by the Government regarding the Reservation. See H-76 Report at 94-95. Congress in the 1904 Act removed mandatory allotment language, unlike statutes regarding other reservations passed a year before and after the 1904 Act.[3] As late as June 1928, the Secretary of the Interior reported that "it has not yet been found to be practicable to allot the Red Lake Reservation." Id. at 96. This congressional recognition of the Band's entrenched opposition to allotment suggests that Congress would have expressly included cession language in the 1905 Act had it intended to diminish the Red Lake Reservation.

The government presented evidence of a contemporaneous understanding that the 1905 Act did not diminish the Red Lake Reservation, including the 1905 letter from MRL&M's attorney requesting a patent for land "in" the reservation. There was testimony at the evidentiary hearing that Tribal members viewed the 1905 Act as a lease of 320 acres, given the lack of negotiations and MRL&M's purpose in obtaining the land for railroad purposes.

---

[3]See, e.g., Act of December 21, 1904, 33 Stat. 595, 596; Act of April 21, 1904, 33 Stat. 189, 217.

Some of the historical context evidence is consistent with an intent to diminish. For example, Jackson argues that an itemized appraisal of Indian owned land on the "proposed townsite," followed by compensation, is evidence of intent to diminish because Congress required that Indians leave the selected land, and there was no Indian presence immediately following the 1905 Act. He suggests the Commissioner of Indian Affairs treated the land as diminished, because his annual reports show the reservation reduced by 320 acres following the 1905 Act. But the reports are ambiguous, because they also refer to the 1905 Act as "granting 320 acres as a right of way." As the Band argues, the "reduction" may simply reflect that 320 acres were no longer available for allotment, not that they were no longer a part of the Reservation. Overall, the record is inconclusive. "[M]ixed historical evidence . . . cannot overcome [a] lack of clear textual signal that Congress intended to diminish the reservation" because it "in no way <u>unequivocally</u> reveal[s] a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." <u>Parker</u>, 136 S. Ct. at 1080, quoting <u>Solem</u>, 465 U.S. at 471.

**C. Subsequent Treatment and Current Character.** The government's treatment of the affected area, especially in the years immediately following the Act, offers "some evidentiary value," and subsequent demographic history can provide an "additional clue" of Congressional intent. <u>Parker</u>, 136 S. Ct. at 1081, quoting <u>Solem</u>, 465 U.S. at 471-72. But subsequent demographic history is the "least compelling evidence in our diminishment analysis." <u>Parker</u>, 136 S. Ct. at 1082.

Jackson presented evidence that deeds of fee-owned property in Redby are registered at Beltrami County, just like non-tribal lands surrounding Red Lake, and that owners of lots within Redby pay property taxes to Beltrami County. He argues that the Band's efforts to restore the 312.09 acres to trust status in 1939, including a $5,000 payment to MRL&M after it abandoned the rail line, shows that the land had been removed from the Reservation by the 1905 Act and the Band had to reclaim it.

The district court concluded that "[d]espite this evidence . . . the Government present[ed] more compelling extrinsic evidence that the 312.09 acres have always retained their Indian character." We agree. Following the 1905 Act, the federal government continued to treat the Reservation, including Redby, uniformly. Government maps include Redby within the Reservation's boundaries, and annual reports of its Superintendent in the 1910s discuss Redby as part of the Reservation.

Today, Redby is one of four legislative districts in Red Lake, providing two elected representatives to the Tribal Council. The government and the Band presented evidence that Redby remains overwhelmingly Indian in character. The town is located six miles inside the Red Lake Reservation's exterior boundary. The Band provides almost all public services, including public utilities, garbage pickup, street maintenance, education, and emergency services. Businesses are licensed and regulated by the Tribal Council. In enforcing the Tribal Code, the Red Lake police make no distinction between trust land and fee land, whether owned by Indians or non-Indians.

## IV. Conclusion.

"[A] holding favoring federal jurisdiction is required unless Congress has *expressly or by clear implication* diminished the boundaries of the reservation . . . ." United States ex rel. Condon v. Erickson, 478 F.2d 684, 689 (8th Cir. 1973). After careful review of this extensive record, the district court determined that the evidence failed to show that Congress clearly and plainly intended that the 1905 Act would diminish the Red Lake Reservation. We agree. The statute's text, while somewhat ambiguous, reflects with the aid of historical records submitted by historian Smith and the Band that Congress intended the 1905 Act to accomplish a needed expansion of MRL&M's existing right-of-way. Subsequent historical records are consistent with this interpretation, and present-day Redby is overwhelmingly Indian in character and governed by the Band's tribal authorities. The record on remand is not unclear,

but even if it were , we must presume Congress did not intend diminishment and hold in the government's favor.  <u>See</u> <u>Solem</u>, 465 U.S. at 481.

For these reasons, the judgment of the district court is affirmed.

_____